DANIEL LEON LUALLEN, Petitioner, v. STATE OF TENNESSEE, Respondent.

453 S.W.2d 453.

Court of Criminal Appeals of Tennessee. Oct. 9, 1969.

On Petition to Rehear Dec. 3, 1969.

Certiorari Denied by Supreme Court April 6, 1970.

330

Arthur B. Stowers, Jr., Harriman, for petitioner.

George F. McCanless, Atty. Gen., Lance D. Evans, Asst. Atty. Gen., Nashville, H. Kenneth Deatherage, Asst. Dist. Atty. Gen., Kingston, for respondent.

## OPINION

WALKER, Presiding Judge.

Luallen appeals from the dismissal of his petition for post-conviction relief after an evidentiary hearing. In June 1950 he was convicted of first degree murder and sentenced to 99 years in the penitentiary. His retained counsel appealed and the Supreme Court affirmed his conviction.

After the evidentiary hearing, the trial judge took the case under advisement and filed his opinion and findings in which he fully considered all of the petitioner's contentions and found them without merit. The record sustains his findings.

██ ██ Most of the petitioner's assignments, as the trial judge found, were presented to the Supreme Court and decided adversely to him in an opinion of which we take judicial notice. The Supreme Court reviewed the case in which the petitioner and a codefendant did not testify. He was convicted largely on the testimony of an accomplice which was thoroughly corroborated. Habeas corpus or post-conviction proceedings may not be employed to raise and relitigate or review questions decided and disposed of in a direct appeal after conviction. State ex rel. Brown v. Newell, 216 Tenn. 284, 391 S.W.2d 667; T.C.A. Secs. 40-3811—40-3812.

The petitioner did not testify in this proceeding although the trial judge and his attorney gave him every opportunity to sustain his allegations.

██ He contends particularly that the trial judge should have granted his motion for a charge of venue

and that he did not have a fair trial under the rules set out in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600.

The Supreme Court approved the trial judge's ruling on the motion for a change of venue and nothing presented here along with the original record shows any violation of his rights.

He complains of the large crowd in attendance at his trial. The number of jurors summoned was large but the proof shows that those present in Kingston were calm and orderly. Most of the publicity of which he complains was contained in Knoxville and Chattanooga newspapers and a detective magazine. This publicity required the trial judge to order a large panel of jurors, but there is nothing to show that the jury was not fair. Unlike the *Shepard* jury, it was sequestered, even though a photograph of it was made by a reporter outside the courthouse. The petitioner received a fair trial and was not prejudiced by unfavorable publicity.

His search and seizure assignments are likewise without merit. While attempting a robbery, the petitioner was himself shot by his victim. At the hospital, his doctor gave to the sheriff the bullet he had extracted from the petitioner. This was done by a private citizen and was not a search by an official. Petitioner's wife gave permission to an officer to search petitioner's home. It disclosed half a lemon, about which the State's witness testified. This search was not unlawful.

The finding of the trial court is conclusive against the petitioner upon questions of fact unless we are able to find that the evidence preponderates against

the judgment of that court. State ex rel. George v. Johnson, 217 Tenn. 1, 394 S.W.2d 641; State ex rel. Lawrence v. Henderson, Tenn.Cr.App., 433 S.W.2d 96.

All assignments of error are overruled, and the judgment of the trial court is affirmed.

This case was heard and submitted to the Court prior to the enactment of Chapter 330 of the Public Acts of 1969 increasing the membership of the Court.

OLIVER, J., concurs.

GALBREATH, Judge (dissenting).

I am compelled to dissent. From the record as I view it the evidence preponderates against the finding of the trial court who failed to find that at the time of the original trial factors existed which should have resulted in a change of venue.

The fact that the petitioner did not testify should be of little significance as he personally had nothing material to add to proof of undue excitement existing at the time of the trial.

Recognizing that post-conviction relief will not ordinarily be granted upon any ground that has been previously determined by a court of competent jurisdiction we must first comment on the opinion of the Supreme Court insofar as it addresses itself to the issue of whether or not a change of venue should have been granted by the original trial judge. The bill of exceptions before us from the murder trial reveals that it was agreed that all motions would be made and considered after the selection of the jury. It would seem that the question of venue

would be more properly disposed of pre-trial, but for some reason apparently agreeable to everyone this matter was not taken up until after prolonged inquiry of prospective jurors. Six hundred veniremen were called and 599 of them exhausted before a jury was empaneled. A motion for severance was made on behalf of a co-defendant, one Eddie Rudder, who was the principal witness against the defendant here and a third co-defendant, Clyde Sands, who was tried jointly with the defendant. Then a motion was made for a change of venue on behalf of the defendant. It was denied. This denial, in my opinion, prevented, or most probably prevented, a fair trial.

The bill of exceptions as exhibited from the original trial indicates that "affidavits, clippings and a copy of a magazine was offered upon the motion" for change of venue. There is an exhibit to the petition in this cause containing a large number of newspaper clippings and a copy of a magazine article dealing with the murder involved here and it is supposed those that predate the trial were part of the material relied on by the defendant to prove the necessity for removing the trial to another county. For some reason not apparent in the record neither these news items nor the affidavits mentioned were made a part of the bill of exceptions. For this reason the Supreme Court did not have before it the proof in the form of such affidavits and clippings and, thus, very properly held that the assignment of error relating to the refusal to order a change of venue was not supported by the record. The privately retained counsel had offered the exhibits and the trial court had ordered them filed, but apparently the clerk failed to transmit

them with the record to the Supreme Court. The Supreme Court in its opinion said:

> "In support of the assignment of error that the trial judge should have granted a change of venue, we find no affidavits in the record to support the petition alleging certain facts to which we have referred. The newspaper articles, and the magazine article referred to, are not a part of the bill of exceptions, and since they are not identified by the signature of the trial judge as exhibits to the petition or otherwise considered by him, this Court cannot consider them."

It is thus seen that the Supreme Court did not have a full opportunity to consider the propriety of the trial judge's ruling on the motion for venue change. Then, too, there have been numerous decisions of the United States Supreme Court in the intervening 18 years that have spelled out more clearly the duties confronting a court to insulate criminal proceedings from bias and prejudicial surroundings sometimes prevalent in a community in which a sensational crime has been committed. See Sheppard v. Maxwell, 384 U.S., 333, 86 S.Ct. 1507, 16 L.Ed.2d 600; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543; Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663; Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424. The basic principle involved has not changed materially and the goal of every criminal trial is still as Mr. Justice Holmes expressed it in Patterson v. Colorado, 205 U.S. 454, 27 S.Ct. 566, 51 L.Ed. 879 (1907):

> "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence

and argument in open court, and not by any outside influence, whether of private talk or public print.

One refinement or modification on the subject of pre-trial publicity and influence is found in the premise that it is no longer necessary to prove as a demonstrative fact that jurors have been so contaminated by outside influences as to make it impossible for an impartial judgment to be reached in the community. Mr. Justice Clark speaking for eight members of the Supreme Court said in Sheppard v. Maxwell, *supra*:

"Only last Term in Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), we set aside a conviction despite the absence of any showing of prejudice. We said there:

" 'It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process.' At 542-543, 85 S.Ct. at 1632 [14 L.Ed.2d at 550].

"And we cited with approval the language of Mr. Justice Black for the Court in In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625 [99 L.Ed. 942, 946] (1955), that 'our system of law has always endeavored to prevent even the probability of unfairness.' "

It is the general law in Tennessee, as elsewhere, that the question of change of venue is one largely within the discretion of the trial judge and there must be a clear abuse of this discretion before it will be disturbed by the appellate courts. See Swain v. State, 219 Tenn. 145, 407

S.W.2d 452, and cases cited therein. In this appeal, however, from an adverse ruling a post-conviction relief act procedure petition we must only determine if the evidence presented in that civil action preponderated against the judgment of the trial court on the issue. Thusly, it will be necessary to discuss the evidence itself in detail to determine if it affirmatively appears that there was proved such a state of affairs as would have required a change of venue under the provisions of T.C.A. § 40-2201, which provides:

> "*Undue excitement as ground for change on defendant's application.*—In all criminal prosecutions the venue may be changed, upon the application of a defendant, when it is made to appear satisfactorily to the court that, from undue excitement against the prisoner in the county where the offense was committed, or any other cause, a fair trial could probably not be had."

Although as noted earlier, the affidavits presented on behalf of the defendant in support of his motion for a change of venue were not available for review by the Supreme Court on the appeal, and for some reason not known there was no re-introduction of them, or testimony from the affiants as to the contents of such affidavits. It is possible that the identity of the "reputable citizens" who made such affidavits are no longer known to the defendant after the passage of so many years or they may no longer be available.

There was preserved, however, the proof relied on by the State to refute the contention of widespread prejudice and undue excitement. In some respects it tends to support these contentions. While all of the witnesses ex-

pressed the conclusion that the defendant could obtain a fair trial under all the circumstances, there is noted a strong element of fact that mitigates against these conclusions throughout the testimony of these witnesses.

A Mr. G. W. King, a 70-year old Justice of the Peace, testified that on the day he was called as a witness, the second day of the trial, Tuesday, June 13, 1950, there was a crowd of some 500 to 700 around the courthouse. The sheriff of the county estimated the crowd in attendance opening day of the trial at between eight and nine hundred people and did not dispute that as many as one thousand were there. The record shows, without controversy, that 600 veniremen were subpoenaed and that only thirteen of them failed to be challenged for one reason or another. Only one prospective juror remained when the twelfth member was seated. A large percentage of those excused was due to formation of a former opinion as to guilt or innocence.

A Mr. W. H. Dunn, operator of a hotel in Kingston, called as a witness for the State, testified that news accounts had referred to the defendant as a former member of a notorious gang of outlaws. He further said "a killing like that is going to create a lot of phases" in response to questions as to the hostility expressed by local citizens towards the defendant and affirmatively testified that the general feeling expressed by local residents was "one of hostility" toward the defendant. In Mr. Dunn's opinion this hostility was a result of what the people had "read and heard."

A former sheriff of the county, Chester Davis, testified on cross-examination:

"\* \* \* most people you talk to think they are guilty."

"'It has kind of got people's minds stirred up the way the thing has been handled to some extent. I admit that."

A former sheriff, tax assessor and Justice of the Peace, Tom Ferguson, testified that the 600 veniremen called exceeded the number called in any other murder case in the county to his knowing. That there had been a great deal of publicity and that about a thousand people came to the courthouse; that their numbers were so great that they couldn't all get in. While stating as did all these witnesses that he felt the defendant could get a fair trial, Mr. Ferguson said, "\* \* \* I don't think there could have been more publicity in the case \* \* \*."

News accounts described the feeling prevalent the week before the trial was to begin as having "\* \* \* aroused residents more than any previous killing in the past quarter century." In one such news account appearing in the Knoxville Journal on the 10th day of June, 1950, two days before the trial was to commence, the sheriff of the county was quoted as complaining of errors in an apparently widely circulated magazine article that had misrepresented the facts in the case.

As suggestive as all of the excerpts from the bill of exceptions of the original trial is that something more than ordinary excitement was generated by the publicity in this case I would not suggest voiding the results of the trial if that were all reflecting on the atmosphere surrounding the trial.

News accounts of the trial in progress contain carefully posed pictures of the trial jury. This should not

have been allowed for obvious reasons by those entrusted with the care of the jury during recesses. It was similar subjecting of the trial jury to undue attention of representatives of the various news media that was instrumental in the United States decision to order a new trial in Sheppard v. Maxwell, *supra*. However, even this additional indication of excessive publicity reaching even into the jury box would not prompt me to grant the relief sought without a great deal more proof to substantiate the contentions of the plaintiff in error.

I find the additional proof that, when added to the cumulative effect of that available before the hearing, preponderates against the judgment of the lower court as to the action of the original trial judge in not granting the motion for a change of venue in an unlikely source. While being questioned about another complaint of the defendant, that of being carried to Brushy Mountain Prison immediately following conviction instead of being retained in the county jail while awaiting a hearing on his motion for a new trial, the Honorable Ray Jenkins, special prosecutor for the State in the murder trial, testified most convincingly as to the atmosphere of hostility that permeated the community in which the defendant went on trial for his life. Mr. Jenkins said:

"Yes, I think in my mind there was a very good reason for taking Mr. Luallen to Brushy Mountain immediately after the conviction. And if you want me to state why I will tell you why * * * a Very prominent business man, Bob Grant, a citizen, a reputable, high-type citizen of this County, had been gunned down in the night time at his home while an attempt was being made to rob him at the point of a pistol. There was

naturally a great deal of interest in the case. And the enormity of the crime, the heinousness of the crime, was such that the Sheriff, I think, exercised good judgment in taking Luallen, and I think his co-defendants, I am not sure about that, out of the County and to a place of safe-keeping * * * I thought the Sheriff exercised very fine judgment because as I stated, the crime was so enormous, so revolting that naturally there was some public excitement and resentment about it. * * * When in the night time one is called from his wife at his home and gunned down by highwaymen, I would be foolish and anybody would be foolish to suppose that there was not some public excitement about it. I do hope that the Supreme Court of the United States will come to that conclusion sometime."

I am in complete agreement with Mr. Jenkins' expert appraisal of the situation and adopt it as the most convincing proof possible that the atmosphere was highly charged with such undue excitement that fears of a lynch mob hung heavily over the rural courthouse in which the defendant had stood trial for his life. The fact that such an emotional undercurrent was still present after the law had inflicted the highest degree of punishment possible short of death removes all doubt that such animosity existed prior to justice being satisfied.

Although the conclusion is expressed throughout by all of the witnesses for the State on the point that they believe the defendant could and did receive a fair trial, the proof strongly mitigates against their conclusions. It is natural, all of them being allied with the prosecution, for these witnesses to be somewhat prejudiced themselves on behalf of the State. They would not be

effective as witnesses and as the attorney for the plaintiff if they were not somewhat biased in favor of their principal. But the eloquent testimony as to the facts, and in particularly Mr. Jenkins' honest appraisal of the situation more than nineteen years afterwards, leaves no doubt that the probability of the defendant getting a trial free from bias and prejudice where such emotions cannot be tolerated, that is on the trial jury itself, was rather remote. Under such circumstances it amounted to constitutional deprivation affecting the right to trial by jury to refuse a request for a change of venue. Article 1, Section 9 of our Constitution, as does the Sixth Amendment to the Federal Constitution, guarantees all persons accused of crime a fair and impartial trial and this a defendant must have.

> "Although we might be satisfied of the prisoner's guilt, yet it is our duty to see that he has a fair and impartial trial, and this he must have though costs may accumulate and punishment be long delayed." Stokes v. State, 64 Tenn. 619.

In view of the above stated reasons, I dissent.

## ON PETITION TO REHEAR

WALKER, Presiding Judge.

In his petition to rehear, the petitioner contends that his constitutional right to a speedy trial has been violated by the delay of the trial court and this court in disposing of his petition. He cites no authority holding that this constitutional right applies to post-conviction cases. The constitutional right to a speedy trial applied to his original conviction. He does not claim that was

violated then, but, on the contrary, his petition alleges that there was public excitement at the time of his trial. We found this without merit.

T.C.A. § 40-3809 provides that the trial court shall grant a hearing as soon as practicable.

■ In a federal habeas corpus case, Reiff v. United States, 299 F.2d 366 (1962) (9th Cir.), without citing authorities, the petitioner urged that his constitutional rights had been violated by delay. The court held that a proper hearing means such a hearing as is consistently prompt with the other business of the court. It does not mean that the court must stop all other proceedings and vacate all the rest of its hearings and defer all of its business pending the hearing of such a petition. See also McDonald v. United States, 9 Cir., 282 F.2d 737. None of petitioner's constitutional rights have been violated here or in the trial court.

■ At the same time, the petitioner contends that the case should be heard by the increased court. He calls attention to the enactment of Chapter 330 of the Public Acts of 1969 increasing the membership of this court. This became effective after the case was submitted but before the State's reply brief was filed and the decision renderd by the Court as constituted at the time of submission. He cites no authority for his position and it is without merit.

■ We did not overlook the question of the corroboration of accomplice testimony. We found no violation of his constitutional rights in it. Furthermore, the rule in this state on corroboration of an accomplice is not a constitutional right under the State or federal

constitution. Federal courts allow a conviction on the uncorroborated testimony of an accomplice, if not incredible or unsubstantial on its face. See Tillery v. United States, 6 Cir., 411 F.2d 644 (1969).

We fully considered all of the petitioner's constitutional questions in the original opinion of the Court, to which we adhere.

The petition to rehear is denied.

OLIVER, J., concurs.