Commonwealth *v.* Tanchyn, Appellant.

Argued December 10, 1962. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Thomas J. Foley, Jr.,* with him *J. Joseph McCluskey,* and *Rosser, McDonald, Marcus & Foley,* for appellant.

*James R. Marsh,* District Attorney, for Commonwealth, appellee.

OPINION BY ERVIN, J., March 19, 1963:

On April 29, 1961, about 12:05 a.m., an automobile collision occurred a short distance north of Stroudsburg on Route 611, a three-lane highway, involving the car of John Tanchyn, the appellant, and another car,

whose occupants, Llewellyn F. Andre and Anna L. Evans, died without regaining consciousness as a result of injuries received in the collision. The appellant was removed by ambulance to the Monroe County General Hospital and admitted about 2:00 a.m. Dr. John L. Rumsey, who was taking night calls, treated the appellant. Dr. Rumsey ordered a sample of the appellant's blood to be taken for a blood test—hemoglobin, hematocrit, a white count and a differential count, and also ordered a urine examination. This was routine procedure with Dr. Rumsey at the hospital. John L. Williams, a technician, after rubbing appellant's arm with zephiran, a non-alcoholic antiseptic, withdrew 15 c.c.'s of blood from appellant at or about 2:30 a.m. After making the test, Williams placed the excess 10 c.c.'s in a glass tube with a stopper and a label and stored it in the blood bank refrigerator. During the taking of the blood the appellant was not totally unconscious but he was disoriented. Dr. Rumsey's treatment of the appellant consisted of inserting 33 sutures in appellant's face and neck. While performing his work Dr. Rumsey smelled alcohol on the appellant. In addition to the facial injuries, appellant suffered an injury to his chest, a condition known as pneumothorax, which involves a rupture of the lung and an accumulation of air in the chest cavity under pressure. The appellant was not completely coherent until the following day. Appellant was in the hospital for a period of two weeks.

In the morning the Monroe County coroner, who had been investigating the cause of the two deaths, requested Dr. Leitner, the hospital pathologist, who arrived at the hospital between 8:00 and 8:30 a.m., to have any excess portion of appellant's blood examined for alcoholic content. Because there are no facilities in Monroe County to make a blood alcohol test, on Monday, May 1, 1961, Dr. Leitner mailed the two test

tubes, each containing 5 c.c.'s of appellant's blood, sealed and labeled with appellant's name, to Dr. Frederic Rieders, Chief Toxicologist for the City of Philadelphia, together with a letter requesting an analysis. Dr. Rieders made the analysis himself and testified at the trial that appellant's blood contained 0.20 per cent alcohol by weight, which indicated a degree of intoxication sufficient to decrease appellant's ability to operate an automobile safely and effectively. The appellant gave neither oral nor written permission to anyone either to take the blood from his body in the first instance or to remove the blood from the hospital to do a blood alcohol test. The coroner did not obtain a search warrant prior to requesting the blood test.

The sole question raised by this appeal is whether the court below erred in admitting into evidence the testimony concerning the blood alcohol test. Counsel for appellant argues that the admission of the testimony was a violation of the fourth Amendment of the Federal Constitution as it applies to the states through the 14th Amendment of the Federal Constitution.

The fourth Amendment to the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Since *Mapp v. Ohio*, 367 U. S. 643, decided June 19, 1961, it is clear that the exclusionary rule arising out of the fourth Amendment as applied in the Federal courts is now applicable to the state courts. It is our opinion that there was no violation of the fourth Amendment in this case because the seizure of appellant's blood was not made by state officials but was

performed by private individuals, to wit, the hospital personnel. Whether the appellant impliedly consented to the taking of the blood by the hospital technicians is immaterial. What was done was for the benefit of the appellant and we assume that if he had been entirely normal he would have willingly consented to the procedure, just as nearly every person does when he enters a hospital or doctor's office for care and treatment. No agents or servants of the Commonwealth of Pennsylvania were present nor did they in any way direct or control the decision of the doctors or technicians to take blood from the appellant. If any blood was taken from the appellant in an unreasonable manner, it was the act of the hospital and its associates. It was not until five or six hours after the blood had been taken from the appellant that the coroner requested that the remaining blood be tested for alcoholic content. It is argued by the appellant that this was a seizure by the coroner from the hospital, which was then the temporary home of the appellant. We believe that this argument is without merit. Certainly the unused blood would never have been reinjected into the appellant and in all likelihood it would have ultimately been thrown away. We do not believe that it is customary to use blood which contains the alcoholic content which this blood did for general blood bank purposes.

The *Mapp* case was one in which the seizure was made by police officers. We cannot believe that it was intended to overrule the case of *Burdeau v. McDowell*, 256 U. S. 465, which was a case dealing with evidence seized by private individuals by blasting open a safe. The majority opinion of the Supreme Court said: "The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended

as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; as against such authority it was the purpose of the Fourth Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued.

"In the present case the record clearly shows that no official of the federal government had anything to do with the wrongful seizure of the petitioner's property, or any knowledge thereof until several months after the property had been taken from him and was in the possession of the Cities Service Company. It is manifest that there was no invasion of the security afforded by the Fourth Amendment against unreasonable search and seizure, as whatever wrong was done was the act of individuals in taking the property of another. A portion of the property so taken and held was turned over to the prosecuting officers of the federal government. We assume that petitioner had an unquestionable right of redress against those who illegally and wrongfully took his private property under the circumstances herein disclosed, but with such remedies we are not now concerned.

"The Fifth Amendment, as its terms import, is intended to secure the citizen from compulsory testimony against himself. It protects from extorted confessions, or examinations in court proceedings by compulsory methods.

"The exact question to be decided here is: May the government retain incriminating papers, coming to it in the manner described, with a view to their use in a subsequent investigation by a grand jury where such papers will be part of the evidence against the accused, and may be used against him upon trial should an indictment be returned?

154

"We know of no constitutional principle which requires the government to surrender the papers under such circumstances. Had it learned that such incriminatory papers, tending to show a violation of federal law, were in the hands of a person other than the accused, it having had no part in wrongfully obtaining them, we know of no reason why a subpoena might not issue for the production of the papers as evidence. Such production would require no unreasonable search or seizure, nor would it amount to compelling the accused to testify against himself.

"The papers having come into the possession of the government without a violation of petitioner's rights by governmental authority, we see no reason why the fact that individuals, unconnected with the government, may have wrongfully taken them, should prevent them from being held for use in prosecuting an offense where the documents are of an incriminatory character."

Even under the *Mapp* case the reasonableness of the search and seizure is, in the first instance, for the trial court to decide. What was said by Mr. Justice CLARK, who wrote the majority opinion in *Breithaupt v. Abram*, 352 U. S. 432, 1 L. ed. 2d 448, 77 S. Ct. 408 (1957), is of interest: "Basically the distinction rests on the fact that there is nothing 'brutal' or 'offensive' in the taking of a sample of blood when done, as in this case, under the protective eye of a physician. To be sure, the driver here was unconscious when the blood was taken, but the absence of conscious consent, without more, does not necessarily render the taking a violation of a constitutional right; and certainly the test as administered here would not be considered offensive by even the most delicate. Furthermore, due process is not measured by the yardstick of personal reaction or the sphygmogram of the most sensitive person, but by that whole community sense of 'decency and fair-

ness' that has been woven by common experience into the fabric of acceptable conduct. It is on this bedrock that this Court has established the concept of due process. The blood test procedure has become routine in our everyday life. It is a ritual for those going into the military service as well as those applying for marriage licenses. Many colleges require such tests before permitting entrance and literally millions of us have voluntarily gone through the same, though a longer, routine in becoming blood donors. Likewise, we note that a majority of our States have either enacted statutes in some form authorizing tests of this nature or permit findings so obtained to be admitted in evidence. We therefore conclude that a blood test taken by a skilled technician is not such 'conduct that shocks the conscience.' Rochin, supra (342 U. S. at 172), nor such a method of obtaining evidence that it offends a 'sense of justice,' Brown v. Mississippi, 297 U. S. 278, 285, 286, 80 L. ed. 682, 686, 687, 56 S. Ct. 461 (1936). This is not to say that the indiscriminate taking of blood under different conditions or by those not competent to do so may not amount to such 'brutality' as would come under the Rochin rule. . . .

"The test upheld here is not attacked on the ground of any basic deficiency or of injudicious application, but admittedly is a scientifically accurate method of detecting alcoholic content in the blood, thus furnishing an exact measure upon which to base a decision as to intoxication. Modern community living requires modern scientific methods of crime detection lest the public go unprotected. The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield. The States, through safety measures, modern scientific methods, and strict enforcement of traffic laws, are using all reasonable means to make automobile driving less dangerous.

"As against the right of an individual that his person be held inviolable, even against so slight an intrusion as is involved in applying a blood test of the kind to which millions of Americans submit as a matter of course nearly every day, must be set the interests of society in the scientific determination of intoxication, one of the great causes of the mortal hazards of the road. And the more so since the test likewise may establish innocence, thus affording protection against the treachery of judgment based on one or more of the senses. Furthermore, since our criminal law is to no small extent justified by the assumption of deterrence, the individual's right to immunity from such invasion of the body as is involved in a properly safeguarded blood test is far outweighed by the value of its deterrent effect due to public realization that the issue of driving while under the influence of alcohol can often by this method be taken out of the confusion of conflicting contentions."

Counsel for the appellant also argues that the admission of the testimony was in violation of the fifth Amendment of the Constitution. We cannot agree with this argument. The appellant did not take the witness stand and he was not compelled to testify at the trial. His blood was not offered in evidence nor was any part of his body introduced into evidence. All that occurred was that Dr. Rieders, the toxicologist, testified as to the alcohol blood test which he had made. In this connection we approve what was said by the court below: "Counsel urge that: (1) just as the 4th Amendment was made applicable to the States through the provisions of the 14th Amendment, so likewise the 5th Amendment is applicable to the States; and (2) the taking of the blood sample without defendant's consent violated his constitutional privilege against self-incrimination under the 5th Amendment.

"The application of the 14th Amendment to the 5th Amendment was thoroughly explored by Mr. Justice CARDOZO in Palko v. Connecticut, 302 U. S. 319, 82 L. Ed. 288 (1937) where he said: '. . . In appellant's view, the Fourteenth Amendment is to be taken as embodying the prohibtions of the Fifth. His thesis is even broader. Whatever would be a violation of the original bill of rights (Amendments I to VIII) if done by the federal government is now equally unlawful by force of the Fourteenth Amendment if done by a state. There is no such general rule . . .

" 'The Fifth Amendment provides also that no person shall be compelled in any criminal case to be a witness against himself. This court has said that, in prosecutions by a state, the exemption will fail if the state elects to end it. Twining v. New Jersey, 211 U. S. 78, 106, 111, 112, 53 L. Ed. 97, 109, 111, 112, 29 S. Ct. 14. Cf. Snyder v. Massachusetts, supra (291 U. S. 105, 78 L. Ed. 677, 54 S. Ct. 330, 90 A.L.R. 575); Brown v. Mississippi, 297 U. S. 278, 285, 80 L.Ed. 682, 56 S. Ct. 461.' (at pages 291, 292).

"In Breithaupt v. Abram, 352 U. S. 432, 1 L. Ed. 2d 448 (1957), the Court cited Palko v. Connecticut, supra, inter alia, in rejecting his contention that the State court violated his rights under the 5th Amendment when it admitted testimony concerning a blood sample taken from him while he was unconscious.

"It does not appear that Mapp v. Ohio, supra, has changed the situation. It is true that Mr. Justice BLACK, concurring, reasoned: '. . . When the Fourth Amendment's ban against unreasonable searches and seizures is considered together with the Fifth Amendment's ban against compelled self-incrimination, a constitutional basis emerges which not only justifies but actually requires the exclusionary rule.' However, Mr. Justice HARLAN (joined by Mr. Justice FRANKFURTER and Mr. Justice WHITTAKER) in his dissenting opinion

pointed out that the majority opinion is merely a judgment overruling Wolf; not a judgment for the basic rationale for reaching that result. He added that the Court had recently reiterated the long established doctrine that the Fifth Amendment privilege against self-incrimination is not applicable to the States: Cohen v. Hurley, 366 U. S. 117, 6 L. Ed. 2d 156, 81 S. Ct. 954 (April 24, 1961). (6 L. Ed. 2d p. 1107).

"Assuming, however, that the Fifth Amendment is applicable here through the operation of the 14th Amendment, is the blood sample evidence subject to the constitutional privilege against self-incrimination?

"The Pennsylvania authorities distinguish between real evidence and testimonial evidence. They hold that the constitutional privilege against compulsory self-incrimination applies only to testimonial evidence: Commonwealth v. Butler, 405 Pa. 36 (July 18, 1961); Commonwealth v. Musto, 348 Pa. 300 (1944).

"This distinction finds support from Federal authority as well. In Blackford v. U. S., 247 F. 2d 745 (1957), the defendant had been convicted of illegally concealing and importing narcotics into the United States. The trial court had received in evidence, after denying a motion to suppress, a quantity of heroin in a rubber container which defendant had secreted in his rectum when crossing the international boundary at San Ysidro. When this was discovered by the customs inspector, he had it removed by a physician, at first against defendant's resistance, but later with his cooperation. Defendant alleged that taking the heroin from him and placing it in evidence violated his constitutional right against self-incrimination under the 5th Amendment. In rejecting this proposition and affirming the conviction, Barnes, Circuit Judge, said: 'Historically and analytically the privilege is confined in scope to testimonial compulsion. ". . . the prohibition of compelling a man in a criminal court to be a

witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." Holt v. United States, 218 U. S. 245, 252-253, 31 S. Ct. 26, 54 L. Ed. 1021.

" 'The privilege protects one only against extracting from the persons own lips an admission of guilt. The distinction between testimonial compulsion and real evidence taken from the person of the accused is one drawn by both the courts and the writers. The privilege never had nor was it intended to have application to the removal of real evidence from the person of the accused. Therefore, the taking of evidence forcibly from appellant's body does not come within the purview of testimonial compulsion. Accordingly, we hold that there has been no infringement of appellant's privilege against self-incrimination.' (at page 754) In accord: Murgia v. U. S., 285 F. 2d 14 (1960); 366 U. S. 977, 81 S. Ct. 1946, 6 L. Ed. 2d 1265, certiorari denied, June 19, 1961. U. S. v. Michel, 158 F. Supp. 34 (1957). And see: Application of Woods, 154 F. Supp. 932 (1957).

"In the instant case, it is therefore clear that the taking of defendant's blood sample did not involve testimonial compulsion, and therefore, was not a violation of his constitutional privilege against self-incrimination under the Fifth Amendment."

Counsel for appellant also argues that the admission of the evidence was contrary to the provisions of the Act of July 28, 1961, P. L. 918, 75 P.S. §624.1. We reject this argument because (1) the Act did not become effective until September 26, 1961, which was after the admission of the evidence, and (2) the Act of 1961 only applies to chemical tests of the breath to show the alcoholic content of the blood and subsection (d) of the Act expressly provides that the Act "shall not be construed as limiting the introduction of

any other competent evidence bearing upon the question whether or not defendant was under the influence of intoxicating liquor." The blood test was "other evidence" and in our opinion was not excluded by the provisions of this Act.

There was circumstantial evidence to show that this accident occurred on the appellant's left-hand side of the road. There was also evidence to indicate that when the appellant left the parking lot a short time before the happening of the accident, he was in such a condition that he did not realize he had run into and damaged another car in the parking lot. There was also evidence that one witness at the scene of the accident and also one of the doctors at the hospital smelled alcohol upon the appellant. The appellant received a very light sentence and we are of the opinion that no error was committed by the trial judge which would justify a reversal.

Judgment of sentence affirmed and the defendant is directed to appear in the court below at such time as he may be there called, and that he be by that court committed until he has complied with the sentence, or any part of it which had not been performed at the time the appeal was made a supersedeas.