WAUKESHA MEMORIAL HOSPITAL, INC., and others, Plaintiffs and Respondents, v. BAIRD, Sheriff of Waukesha County, and others, Defendants: KENNELLY, Commanding Officer, Wisconsin State Patrol, Defendant and Appellant.

*No. 57. Argued January 9, 1970.—Decided February 3, 1970.*
(Also reported in 173 N. W. 2d 700.)

632

For the appellant the cause was argued by *Sverre O. Tinglum,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

For the respondents there was a brief by *Lowry, Hunter & Tikalsky,* and oral argument by *Thomas E. Anderson,* all of Waukesha.

HEFFERNAN, J. When there is a demurrer to a complaint for a declaratory judgment, the question presented initially is not whether the complaint so states a meritorious cause of action that the plaintiffs should prevail on the merits if, in fact, the facts alleged are true, but rather it poses the question of whether the controversy is one which should be considered and heard on the merits. An order overruling the demurrer and holding that a proper cause of action for declaratory judgment exists permits the exploration of the merits. The question raised on appeal is simply whether the declaratory judgment device may be properly used to adjudicate the plaintiffs' claim.

This action is brought under sec. 269.56, Stats., the Declaratory Judgment Act. This court in *State ex rel. La Follette v. Dammann* (1936), 220 Wis. 17, 22, 264 N. W. 627, adopted Prof. Edwin Borchard's statement

of four conditions precedent to entertain a declaratory judgment action.

"(1) There must exist a justiciable controversy—that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it.

"(2) The controversy must be between persons whose interests are adverse.

"(3) The party seeking declaratory relief must have a legal interest in the controversy—that is to say, a legally protectible interest.

"(4) The issue involved in the controversy must be ripe for judicial determination. Borchard, Declaratory Judgments, pp. 26–57."

The court in that case stressed that it would not render merely advisory opinions and summarized the Borchard tests in the statement:

"Do the allegations of the complaint reveal a justiciable controversy between adverse interests in which the plaintiff has a legal or protectible interest which is now ripe for judicial determination?" (p. 22)

In the preface to Professor Borchard's second edition of his treatise on *Declaratory Judgments,* p. viii, he expressed some disappointment in the "lack of social perspective" and the "inhospitality of certain judges . . . to the simplication of procedure," and he quotes with apparent approval Thurman Arnold's complaint of "the inadequate service obtained from the courts by their insistence upon 'trial by combat.' " He points out (p. ix) that the use of declaratory judgment "with its speed, inexpensiveness and simplicity, its promotion of a civilized approach to judicial relief commends it. Trial by battle and its concomitant drains are replaced by an earnest but not necessarily embittered submission of legal differences for an adjudication carrying no coercive penalties."

Borchard says in the preface to the first edition (appearing on page xiv of the second edition):

"Thus the declaratory action, in extending the opportunity for such judgments to all legal relations, inaugurated no startling novelty, but merely recognized that individual and social peace and security are promoted by removing clouds from legal relations whenever, by attack, challenge, or denial, they are placed in doubt and uncertainty. The action implies a recognition of the fact that the social equilibrium is disturbed not merely by an overt violation of private rights, but by a challenge which places them in doubt and uncertainty.

"This has required a broadening of the conception of 'cause of action' and of the view that the judicial process is merely a means of redress for committed physical 'wrongs.' It required an appreciation of the fact that harm is done and rights are jeopardized by mere dispute or challenge without any physical attack. The mere existence of a cloud, the denial of a right, the assertion of an unfounded claim, the existence of conflicting claims, the uncertainty or insecurity occasioned by new events—these phenomena constitute the operative facts, the cause for action which creates the 'right of action.' The court in rendering a judicial declaration of rights thus becomes an instrument not merely of curative but also of preventive justice." Borchard, *supra,* at p. xiv.

While most declaratory judgments have been brought in civil actions, it appears indisputable that declaratory relief should be available in a proper case where the complainant is concerned with his rights under the criminal statutes. *See Declaratory Relief in the Criminal Law,* 80 Harvard Law Review (1966–67), 1490.

In the instant case the complaining doctors and hospital asked for a declaration of their rights in respect to both the criminal and civil law. They desire resolution of the authority of police officers to order that a blood test be taken and their criminal liability if they refuse to obey the order, and a resolution of the question of their legal liability in tort in the event they take blood from a nonconsenting individual.

It is, of course, strongly engrafted in our law that one should not be convicted of a violation of an *ex*

*post facto* law. The essence of the plaintiffs' complaint in respect to the allegedly threatened criminal violation is that they are not at the present time able to determine whether their refusal to obey an order will be unlawful. They fear that their refusal to perform what they consider to be an unlawful act may, at a later date, be determined to be the refusal to carry out a lawful order. It is accepted as an axiom of American constitutional law that failure to give a defendant fair warning of the consequences of his conduct, when such conduct is determined to be unlawful only after the fact, provides a constitutional defense.

Another hazard of not being able to know whether criminal penalties will apply as the result of a certain course of conduct is the danger that threats of prosecution may prevent the exercise of socially desirable constitutional rights. In the instant case the right which the plaintiff physicians apparently claim they will lose as the result of the threat of prosecution is the right to the exercise of sound medical discretion to determine whether or not, under the subjective facts or circumstances of a particular case, to perform medical procedures that may be dangerous and may subject them to liability. The threat of prosecution creates the inhibiting effect of doubt, which prevents the assertion of what might be the right to pursue a medically indicated course of conduct. The conduct of the physician, if not unlawful, is entitled to the full protection of the law and ought not be inhibited by a mere doubt.

On the other hand, in injunction proceedings in *Douglas v. Jeannette* (1943), 319 U. S. 157, 63 Sup. Ct. 877, 87 L. Ed. 1324, the United States Supreme Court refused to enjoin threatened criminal prosecution under a municipal ordinance, stating:

"No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guar-

anties, is not a ground for equity relief since the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction." (p. 163)

In the case of *Kagel v. Brugger* (1963), 19 Wis. 2d 1, 119 N. W. 2d 394 (a tort action), this court was confronted with the claim that a citizen who, in pursuance to the orders of the police, placed his truck across a roadway to block the path of a fleeing fugitive was liable for damages. In that case, the court found without difficulty that the police order was authorized. Mr. Justice HALLOWS, writing for the majority of the court, found there was no cause of action stated against the citizen who drove his vehicle into the position prescribed by the police and that a refusal to carry out the order, the statutory basis for which was clear in that case, would have required that the citizen run the risk of criminal sanctions for refusal to aid a police officer as required by sec. 946.40, Stats. As Mr. Justice HALLOWS stated, "Must a citizen choose between the risk of Scylla and the risk of Charybdis at his peril?" *Kagel v. Brugger, supra,* page 8. The clear answer in that case was that in those circumstances the citizen need not run that risk. This court, therefore, does not agree that in no instance where criminal prosecution is threatened there ought not be recourse to the courts for a predetermination. It should be pointed out, however, that in *Kagel* the court had before it the facts as they had actually occurred and was dealing with a statute whose effect in that particular case was not to be doubted.

The instant case is an outgrowth of the decision of the United States Supreme Court in *Schmerber v. California* (1966), 384 U. S. 757, 86 Sup. Ct. 1826, 16 L. Ed. 2d 908. In that case the court held that the withdrawal of body fluids—blood—for the purpose of determining the degree to which a person was under

the influence of alcohol did not constitute a violation of the federal constitutional prohibition against self-incrimination. The court pointed out that the right against self-incrimination applies to the use of testimonial evidence. The court held, however, that the withdrawal of blood for the purpose of making an alcohol test constituted a "search and seizure" under the fourth amendment. The question the court posed in *Schmerber* was "whether the means and procedures employed in taking [the suspect's] blood respected relevant fourth amendment standards of reasonableness." (p. 768.) In *Schmerber* they found the conduct of the police officer in making the test was reasonable. That court stated on numerous occasions in the opinion that the only question was whether the conduct was reasonable "in this case" and emphasized that its holding was precedent only for the exact state of facts appearing therein.

In the *Schmerber Case* the court pointed out that the defendant was under arrest and that there was probable cause for a search because of his physical manifestations and his appearance of intoxication. The court also stated that the search should optimumly have been made by the use of a search warrant. Relying upon *Johnson v. United States* (1948), 333 U. S. 10, 68 Sup. Ct. 367, 92 L. Ed. 436, and *Aguilar v. Texas* (1964), 378 U. S. 108, 84 Sup. Ct. 1509, 12 L. Ed. 2d 723, the court pointed out:

"Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned. The requirement that a warrant be obtained is a requirement that the inferences to support the search 'be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' . . . The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great." (p. 770)

Nevertheless, the court concluded that, under the circumstances where the physical manifestations of intoxication were apparent and where an arrest was in fact made, it was reasonable to secure the evidence of blood content as "an appropriate incident to petitioner's arrest" (p. 771). The court in reaching its conclusion took judicial notice of the established scientific fact that the percentage of alcohol in the blood begins to diminish shortly after the drinking stops. Given these "special" facts, the court concluded that the officer could reasonably believe that he was confronted with an emergency and a delay necessary to secure a warrant would threaten the destruction of the evidence. While the court pointed out that the extraction of a small amount of blood for this purpose in a hospital under proper supervision involved "virtually no risk, trauma, or pain" (p. 771), it made it clear that it did not decide whether the withdrawal of blood would have been constitutionally proper where the petitioner was "one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing" (p. 771). The opinion of Mr. Justice BRENNAN concluded with the statement:

"It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." (p. 772)

It appears clear, therefore, that the *Schmerber* court did not intend to lay down guidelines which purported to cover all circumstances in which the withdrawal of blood is permitted or, conversely, those circumstances under which it would violate the constitutional prohibition against unreasonable searches and seizures. It merely decided that the withdrawal of blood against ob-

jection did not constitute incriminating *testimonial* evidence and that, under the particular circumstances of the case, the withdrawal of blood from a nonconsenting individual was not unreasonable. In so limiting its decision, it followed the traditional rationale of all courts in refusing to delineate in advance precisely what constitutes a reasonable search and seizure. A statement of this policy appears in *United States v. Rabinowitz* [1] (1950), 339 U. S. 56, 63, 64, 70 Sup. Ct. 430, 94 L. Ed. 653:

"What is a reasonable search [and seizure] is not to be determined by any fixed formula. The Constitution does not define what are 'unreasonable' searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case."

The very question that the complainants would have the court resolve is in doubt. They ask for a declaration of their rights to refuse the order of an officer to withdraw blood from a nonconsenting subject. They predicate their case on the belief that the conduct is without statutory authorization. They also point out that they have been threatened with prosecution should they refuse to obey the order of the law enforcement officer. They, however, nowhere in the complaint point out under what statute prosecution is threatened. True, in the briefs and at oral argument they pointed out that sec. 946.40, Stats., provides:

"946.40 **Refusing to aid officer.** (1) Whoever, without reasonable excuse, refuses or fails, upon command,

---

[1] Although the rationale of the *Rabinowitz* decision was repudiated in *Chimel v. California* (1969), 395 U. S. 752, 89 Sup. Ct. 2034, 23 L. Ed. 2d 685, the quoted *Rabinowitz* language continues to be a viable statement of the subjective examination required in each case involving a contested search and seizure, although *Chimel* points out at page 765, "those facts and circumstances must be viewed in the light of established Fourth Amendment principles."

to aid any person known to him to be a peace officer may be fined not more than $100.

"(2) This section does not apply if under the circumstances the officer was not authorized to command such assistance."

That statute is highly subjective in nature. It provides that "reasonable excuse" may exonerate one who refuses to aid the officer. Moreover, the statute is not applicable if "under the circumstances" the officer was not authorized to ask for the assistance. Without deciding that sec. 946.40, Stats., is the statute under which prosecution is threatened, for nowhere in the complaint is that statute referred to, it is clear that we are not informed of facts, even hypothetically, which would enable this court to satisfactorily resolve the question of "reasonable excuse" "under the circumstances."

Neither the statute nor the facts that might trigger an interpretation of the statute are before the court. Even were we to assume, which we do not in this case, that this statute, properly invoked, could trigger a lawful search by the taking of a blood test from a nonconsenting subject, we cannot hypothetically assume that the facts which made the *Schmerber* situation constitutionally antiseptic would exist in cases that might arise in the future. In *Schmerber* it was clear that there were clinical indications of intoxication, the subject was under arrest, the officer was faced with an emergency, there was evidence that the subject had been driving an automobile at or about the time he manifested symptoms of drunkenness, and the individual made no objection on the grounds of health or religion to the testing.

It would appear that the complainants ask this court to do what the United States Supreme Court in *United States v. Rabinowitz, supra,* said is impossible—to predetermine by fixed formula the limitations of a reasonable search. There are a number of subjective factors that would appear in any actual case of the nature contemplated by the plaintiffs which have not even been

alluded to in the complaint and which would be highly relevant in determining the reasonableness of a search.

The complainants ask the courts to search the statutes and the constitution for authority of the police to determine under what statutes physicians might, either legally or illegally, be ordered to take blood specimens. The only allegation is that the physicians are threatened by a police officer with prosecution. They do not assert that the threat has been made by the district attorney, the only officer who is constitutionally authorized to exercise the state's right of actual prosecution, even in cases where a charge or a complaint has been made by a police officer. We are merely asked to assume that, because one threat has been made, this constitutes state policy. While we are advised that the attorney general has circularized law enforcement officers and district attorneys informing them that under the *Schmerber Case* blood samples may be taken from nonconsenting individuals, we are not informed whether or not that circularized advice carried with it a statement that it was the attorney general's policy to prosecute those who refuse to consent to the blood test or refuse to aid in obtaining the blood sample or whether the attorney general's advice was limited to the exact *Schmerber* situation.

Additionally, the plaintiffs ask that there be a final determination of the rights of the person from whom a blood specimen is to be taken. It would appear that for a definitive determination of the rights of such an individual there should be a party to the suit who asserts those rights. The assertion of those rights could only be intelligently discussed and finally settled in a case where the circumstances of the violation of the individual's body were clearly before the court. Moreover, only if there were a determination that the subject from whom the blood is taken had a right of action against the doctor for an intentional battery or for negligently performing a lawful act, does the plaintiffs'

concern with respect to their right of indemnity against the state become justiciable.

It is clear that what the plaintiffs ask is for an advisory opinion in which they wish the court to assume various hypothetical states of fact and determine their liability prospectively under each of these states of fact. Their prayer for relief asks this court to determine "under what" circumstances the plaintiffs have a duty of obeying the police orders. We have not been given a set of facts, even of a hypothetical nature, to use as a basis for resolving the legal question. They ask us to pose our own hypothesis. We doubt that our speculation in regard to what law might be used by police authorities to implement their orders or our fancy in regard to fact situations with innumerable variations would be at all helpful to the plaintiffs or definitively determine their rights in a multitude of different fact situations that may arise. Nor would an opinion based on these premises resolve the rights of any of the parties who are not represented in this action and who may well have substantial rights at stake in an actual search and seizure.

We recognize that, under some circumstances which this court could imagine, the plaintiffs herein could run the risk of prosecution. Whether such prosecution could be successfully maintained both as to the applicability of a statute and as to whether the facts properly triggered the activation of the statute must abide a case in which the necessary factual underpinnings make possible a judicial determination.

In the event that one is charged with the violation of a statute that is either unconstitutional or is unconstitutionally applied, our law is replete with remedies that may bring a speedy resolution to those questions without the necessity of prolonged criminal prosecutions.

While there are undoubtedly situations in which declaratory relief may be invoked in the face of threatened criminal prosecutions, the facts in this case are too

shifting and nebulous for the invocation of the remedy of declaratory judgment. This court stated in *City of Milwaukee v. Milwaukee County* (1950), 256 Wis. 580, 583, 42 N. W. 2d 276:

" '. . . a declaration would be likely to create uncertainty as to the rights of an unascertainable number of officers and citizens who are not parties to this action. The statute justifies a declaration of rights only upon an existing state of facts.' "

The demurrer must be sustained and the complaint dismissed.

*By the Court.*—Order reversed, with directions to dismiss the complaint.