STATE, Plaintiff in error, v. JENKINS, Defendant in error.

*No. 76–558–CR. Submitted on briefs September 6, 1977.—*
*Decided November 1, 1977.*
(Also reported in 259 N. W. 2d 109.)

For the plaintiff in error the cause was submitted on the briefs of *Bronson C. La Follette,* attorney general, and *David J. Becker,* assistant attorney general.

For the defendant in error the cause was submitted on the brief of *James B. Connell* and *Crooks, Crooks & Low, S.C.* of Wausau.

DAY, J.   This is an appeal from an order suppressing evidence of blood alcohol test results prior to a trial for negligent homicide by intoxicated use of a motor vehicle.  The trial court suppressed the test results as a violation of the search and seizure provisions of the fourth amendment because the defendant was not under arrest at the time the blood was drawn.  We reverse the trial court order because the state was not involved in taking the tests and thus there was no search or seizure within the meaning of the fourth amendment.

The doctor-patient privilege does not apply under sec. 905.04(4)(d), Stats. to homicide trials and therefore the defendant could not have a reasonable expectation that the test results would remain private.

On December 19, 1975 an automobile driven by the defendant in error, Clerance Jenkins (hereinafter defendant), on Highway 10 in Portage County collided with an automobile in which Susan Moriarity was a passenger.  Susan Moriarity died of injuries suffered in the collision.

Following the accident, the defendant was conveyed by ambulance to the emergency room of St. Michaels Hospital in Stevens Point and treated by Dr. Robert

Slater. The defendant was intermittently conscious and unconscious. During a period of unconsciousness and without the defendant's consent, Dr. Slater ordered a number of tests performed, including a blood test for alcohol. The purpose of the tests were diagnostic and were not taken at the request of any police officer. The defendant was not under arrest when the blood sample was taken. The results of the test showed a blood alcohol level for the defendant of .20% by weight.

The trial court found that the prosecution obtained the results of the blood tests from Dr. Slater prior to the issuance of a complaint. Neither party to this controversy disputes that finding although we find no direct support for it in the record. The record also lacks any explanation of how the prosecution obtained the test results from Dr. Slater.

At the argument on the suppression hearing, the Portage County District Attorney stated that he had no information that the defendant had been drinking on the day of the accident until he received an anonymous phone call to that effect during the summer of 1976. On August 6, 1976, nearly eight months after the accident, a complaint was issued by the Portage County District Attorney charging the defendant with homicide by the negligent and intoxicated use of a motor vehicle contrary to sec. 940.09, Stats.[1]

Dr. Slater testified as to the results of the blood test at the defendant's preliminary hearing on September 20, 1976. Following the preliminary hearing, the de-

---

[1] "940.09. *Homicide By Intoxicated User Of Vehicle Or Firearm.* Whoever by the negligent operation or handling of a vehicle, firearm or airgun and while under the influence of an intoxicant causes the death of another may be fined not more than $2,500 or imprisoned not more than 5 years or both. No person shall be convicted under this section except upon proof of causal negligence in addition to such operation or handling while under the influence of an intoxicant."

fendant was bound over to the Portage County Circuit Court for trial. On October 20, 1976, the defendant moved to suppress the results of the blood alcohol test. Following arguments by counsel on October 28, 1976, Circuit Judge James H. Levi granted the motion to suppress the results of the blood alcohol test in an order dated December 23, 1976. The Portage County District Attorney made a motion to reconsider the order suppressing the test. That motion was denied March 9, 1977. On March 15, 1977, this court issued a writ of error to review the December 23, 1976 order. On May 23, 1977, this court denied the State's motion for summary reversal and granted the State's alternative motion to advance the case on the calendar.

The question is: Is a blood test taken of a person not under arrest at the request of a physician solely for purposes of diagnosis and treatment and not at the request of any governmental authority, a search and seizure under the fourth amendment?

The defendant argues that the taking of blood is a search and seizure. *Schmerber v. California*, 384 U.S. 757, 763, 86 S. Ct. 1826, 16 L. Ed.2d 908 (1966); *Waukesha Memorial Hospital v. Baird*, 45 Wis.2d 629, 173 N.W.2d 700 (1970). ". . . arrest, and therefore probable cause for making it, must precede the taking of a blood sample." *Scales v. State*, 64 Wis.2d 485, 494, 219 N.W.2d 286 (1974). Defendant contends that neither an arrest nor probable cause for making an arrest existed prior to taking the blood sample in this case, thus the search was illegal and the results must be suppressed. *State v. Kroening*, 274 Wis. 266, 272, 79 N.W. 2d 810 (1956).

The state does not dispute the legal propositions set forth by the defendant but says they are inapplicable to this case because of the lack of state action involved. The defendant contends that the fruits of this search should be suppressed even if there was no state action.

The leading case is *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S. Ct. 574, 65 L. Ed. 1048 (1921). In that case a corporation stole voluminous records from a former employee and turned them over to the prosecution. The U.S. Supreme Court stated the fourth amendment prohibition against unreasonable searches and seizures was designed to protect people from government searches and did not apply to the acts of private individuals. This rule was most recently reiterated in *United States v. Janis*, 428 U.S. 433, 456, 96 S. Ct. 3021, 49 L. Ed.2d 1046 (1976). The rule has been questioned, but not rejected in any federal case, 36 A.L.R., 3rd, 553 §4.

This court has accepted the *Burdeau* rule. In *Mears v. State*, 52 Wis.2d 435, 190 N.W.2d 184 (1971), a mother called the police after finding furs in her son's room which she suspected he had stolen. When the police arrived, she showed them the furs and they left the house to trace the furs to see if they were stolen. When the police returned, the mother executed a written consent to search the house. When the validity of the search was questioned on appeal, this court held that the mother had sufficient control over the house to agree to the search. But the court also cited *Burdeau, supra,* and stated that the furs were separately admissible as the product of a private search.

A private search was also considered beyond the reach of the exclusionary rule in *State v. Killory*, 73 Wis.2d 400, 416, 417, 243 N.W.2d 475 (1976).

The *Burdeau* rule has been criticized and the defendant cites *State v. Coburn*, 530 P2d 442 (Mont. 1974) as a case where the rule has been rejected. The Montana court considered and consciously disregarded *Burdeau,* but their decision rested not only on the fourth amendment, but Art. II, Sec. 10 of the Montana State Constitution which recognizes the right to privacy.

One of the reasons for the exclusionary rule is to deter the police from illegal searches by denying them convictions based on the fruits of illegal searches. The policy behind not applying the exclusionary rule in private searches is that private individuals will not be so deterred, because they have less knowledge of criminal procedure and are not interested in getting convictions, 36 A.L.R.3d 558, 559. This policy is questionable where private investigators or security police with some knowledge of criminal law make illegal searches to obtain convictions. But the policy of *Burdeau* is served by admitting the evidence in this case because the hospital personnel involved in the case were concerned solely with obtaining information for diagnosis and treatment.

The defendant and the trial court relied on two factually similar foreign jurisdiction cases to argue that the facts of this case demonstrate state action requiring the protection of the exclusionary rule. In *People v. Todd*, 7 Ill. App.3d 617, 288 N.E.2d 512 (1972); affirmed 59 Ill.2d 534, 322 N.E.2d 447, 450 (1975); the defendant was involved in a fatal automobile accident and taken to a hospital for treatment. A blood test was taken by a physician who informed the defendant that a test was being administered for examination purposes. The defendant neither consented nor objected to the test. The defendant was not placed under arrest. Both the Illinois appellate and supreme courts upheld the trial court's suppression of the alcohol test. This case is somewhat similar to the case at bar, but the statement of facts by the Illinois Supreme Court shows that the blood test was taken at the request of a police officer. That fact clearly distinguishes *People v. Todd, supra,* from the case at bar.[2]

---

[2] Private searches are subject to the exclusionary rule if they are made by agents or instruments of the state, *Coolidge v. New Hampshire,* 403 U. S. 443, 487 (1971), such is not the case here because there was no request by the police for anyone to take a blood alcohol test.

In *State v. Davis,* 226 A.2d 873 (N.H. 1967), two samples of blood drawn from the defendant at the request of the treating physician were put in containers normally used by the police for alcohol testing and taken to the state crime laboratory where they were tested. The evidence didn't show by what authority or by whose direction the blood was transported from the hospital to the crime laboratory. The court cited *Schmerber, supra,* for the proposition that blood could only be withdrawn incident to a lawful arrest and the court suppressed the test results.

The Attorney General cites *Commonwealth v. Tanchyn,* 200 Pa. Super. 148, 188 A.2d 824, 826 (1963), where the court allowed admission of blood tests on facts similar to this case because the tests were performed by private individuals. See also, *State v. Richerson,* 87 N.M. 437, 535 P.2d 644, 647 (1975).

The defendant also contends there was sufficient state action to invoke the exclusionary rule because the prosecution undertook a search and seizure when they obtained the hospital records from Dr. Slater. The defendant contends that the test reports are papers and effects within the meaning of the Wisconsin and U. S. Constitution and that he had a reasonable expectation that the records would be kept private based partially on Wisconsin's Administrative Code Med. 10.02 (2) (n)[3] concerning confidentiality of a patient's records.

However, the record does not clearly support the defendant's position that the test records were taken by search or seizure from Dr. Slater. The version of the

[3] "Med. 10.02. *Definitions* . . . (2) The term 'unprofessional conduct' is defined to mean and include but not be limited to the following, or aiding or abetting the same: . . . (n) Willfully divulging a privileged communication or confidence entrusted by a patient or deficiencies in the character of patients observed in the course of professional attendance, unless lawfully required to do so . . ."

facts most favorable to the defendant in this regard is the statement of the trial court in its opinion that,

"Prior to the issuance of the complaint, the prosecution had obtained from Dr. Slater, the treating physician, without the consent or knowledge of the defendant, the results of the blood alcohol test."

This statement is not supported by any testimony, although neither party questions its truthfulness.

Here the blood was drawn strictly for diagnostic and treatment purposes. The blood was not drawn by the doctor at the instigation, request or suggestion of the police. Neither was the blood drawn by the doctor for the purpose of turning it or the results of the alcoholic content test over to the police. Under these facts, the drawing and testing of the blood did not come under the definition of "search and seizure" as that term is used in the United States and Wisconsin Constitutions. This was purely a private taking, not a governmental action or seizure at the time the blood was taken.

The record shows that Dr. Slater testified as to the results of the test. No documentary evidence was placed in the record. The record does not show that the doctor was subpoenaed to testify but at the time of the suppression hearing, the district attorney advised the court: "It involved subpoenaing Dr. Slater to get the blood test results." Whether this refers to the preliminary hearing or some other proceeding is not specified. The doctor's testifying later as to such taking and testing in this case did not convert what was strictly a private act into a governmental act that made either the fact of the taking and testing or its revelation at the preliminary hearing a "search and seizure" as that term is used in the Federal and State Constitutions.

We hold that where a blood test is taken at the request of a physician, solely for diagnostic purposes and

not at the request or suggestion of any governmental authority, there is no search and seizure within the meaning of the fourth amendment to the United States Constitution. Nor is there a search and seizure because the doctor later testifies concerning the results at a homicide trial.

The second issue is whether the testimony of Dr. Slater or the test results were inadmissible because the defendant had a reasonable expectation of privacy under the doctor-patient privilege. The privilege is granted by statute, sec. 905.04(2), Stats.[4] The defendant also cites Wisconsin Administrative Code Med. 10.02(2)(n) which provides that it is unprofessional conduct for a doctor to divulge information concerning a patient.

One of the exceptions to this privilege is found in sec. 905.04(4)(d), which provides:

"*Physician-patient Privilege. . . . Exceptions . . . Homicide Trials.* There is no privilege in trials for homicide when the disclosure relates directly to the facts or immediate circumstances of the homicide. . ."

This statute must be read in connection with sec. 911.-01(3), Stats. which reads in part as follows:

"*911.01. Applicability Of Rules Of Evidence. . . .* (3) . . . Chapter 905 with respect to privileges applies at all stages of all actions, cases and proceedings. . ."

Testimony concerning blood alcohol test results at a trial for negligent homicide are not privileged under

---

[4] "*905.04. Physician-Patient Privilege. . . .* (2) *General Rule of Privilege.* A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of his physical, mental or emotional condition, among himself, his physician, or persons, including members of the patient's family, who are participating in the diagnosis or treatment under the direction of the physician. . ."

the doctor-patient relationship and the defendant had no reasonable expectation of privacy concerning those test results.

*By the Court.*—Order suppressing evidence reversed.