COMMONWEALTH *vs.* JOHN P. STORELLA, JR.

Middlesex.    October 11, 1977. — May 4, 1978.

Present: HALE, C.J., GRANT, & ARMSTRONG, JJ.

*Search and Seizure. Constitutional Law*, Search and seizure, Evidence obtained by private party.

Surgical removal of a bullet from a defendant's body, after notification of police by the doctor pursuant to G. L. c. 112, § 12A, and the doctor's turning the bullet over to police who used it as evidence in a subsequent prosecution of the defendant for robbery did not constitute a search and seizure within the scope of the Fourth Amendment to the United States Constitution, where the doctor was not acting as the agent of the police but rather as a private citizen cooperating with them and where the operation was performed solely for medical reasons and only incidentally resulted in the recovery of evidence for police use. [312–316]

INDICTMENT found and returned in the Superior Court on July 3, 1974.

Pretrial motions were heard by *Taveira*, J., and the case was heard by *Griffin*, J.

*Ira M. Lisook* for the defendant.

*Roberta T. Brown*, Legal Assistant to the District Attorney, for the Commonwealth.

ARMSTRONG, J. On May 2, 1974, the defendant, giving a false name and address, walked into the emergency room of the Bon Secours Hospital in Methuen with a bullet wound. The bullet had entered through his neck and had lodged itself behind his left ear, near the mastoid process. The defendant was not in acute distress, though he had some pain.

The hospital notified the Methuen police department, as required by G. L. c. 112, § 12A, and Captain DeSantis went to the hospital on May 3 to question the defendant.

Commonwealth *v.* Storella.

The latter gave his correct name and a false address different from the one given earlier. He said that he had been involved with a married woman and had been beaten and shot by her irate husband on April 29, but he refused to divulge their names. He said he had given a false name because he was married and did not want his own wife to learn about the affair which had led to his being shot.

Dr. Dragone, a surgical resident who undertook care of the defendant, advised him that the bullet was not an immediate danger to his health but that it should be removed and could lead to serious complications if it were not. The defendant postponed surgery for two days and then left the hospital on May 5. He telephoned Captain DeSantis on May 7, and informed DeSantis that he had decided not to have the bullet removed.

Meanwhile, the May 4 edition of the Lawrence *Eagle Tribune* had carried a story about the defendant's admission to the hospital and the amorous explanation he had given for the gunshot wound. The story was seen by Sergeant Willcox of the Malden police, who had been investigating an armed robbery of a Malden liquor store on the evening of April 29. One of the three robbers had been shot by the proprietor during their getaway. Sergeant Willcox contacted Captain DeSantis and the hospital and arrangements were made for him to be notified if the defendant showed up again at the hospital.

On May 7, and again on May 14, the defendant appeared at the hospital to have his wound examined (he was being treated with antibiotics) and was advised again, on each occasion, to have the operation performed. On the latter date, Dr. Dragone told the defendant that the police would get the bullet eventually, apparently explaining to the defendant what the judge found to be the normal hospital procedure, to turn bullets over to police for ballistics examination after they were removed surgically. On May 14, the defendant signed a consent form for an operation, and the operation was scheduled to be performed May 17.

That morning Captain DeSantis, who had been notified by either Dr. Dragone or by a Dr. McCarthy, a staff surgeon, in turn notified Sergeant Willcox of the Malden police. Willcox received two calls: the first, at 9:00 A.M., indicating that the operation would take place at 1:30 P.M., and the second, about an hour after the first, indicating that the time of the operation was to be advanced to 11:00 A.M. Willcox called one Windisch, a State ballistician, and both went to the hospital, joining Captain DeSantis. None had obtained a search warrant.

DeSantis was given permission, either by Dr. McCarthy or by a head nurse, to be present in the operating room when the operation took place. DeSantis dressed for surgery, entering the operating room, according to the defendant's allegations (the judge's findings are silent on the subject), after the defendant was anesthetized and without any prior knowledge by the defendant that he was to be there. The operation began at 11:29 A.M. At 11:46 A.M. Dr. Dragone removed the bullet, washed it, and handed it to DeSantis. The latter gave it directly to Windisch, the ballistics expert, who was waiting outside the operating room. By 2:30 P.M. Windisch reported to Willcox that he had identified the bullet as having come from the gun used by the proprietor of the liquor store on the evening of April 29.

Through the use of the bullet and the ballistics report, the Commonwealth secured the indictment and conviction of the defendant for robbery while masked and armed with a dangerous weapon. The sole questions presented in this appeal are whether the judge who denied the defendant's pretrial motion to suppress that evidence erred in so doing and whether he erred in denying the defendant's motion (also pretrial) to reopen and reconsider his earlier action on the basis of "newly available" testimony.

One of the factual conclusions on which the judge predicated his denial of the motion to suppress was that the doctor who removed the bullet and turned it over to

the police was not acting as an agent of the police but merely as a private citizen cooperating with the police by turning evidence of crime over to them. It has long been settled that the Fourth Amendment to the United States Constitution applies only to searches and seizures taken by or at the direction of the State; and, consequently, evidence obtained illegally by private parties and turned over to the police is not obtained in violation of the Fourth Amendment. *Burdeau* v. *McDowell*, 256 U.S. 465, 475 (1921).[1] The judge's finding concerning lack of agency is therefore dispositive of the case, assuming that it was warranted by the evidence and involved no misapplication of constitutional principles.

On the first score, the evidence adduced at the hearing on the motion to suppress fully supported the finding. In particular, there was ample evidence that the operation was necessitated by good medical practice, was advised as necessary (though not on an emergency basis) from the outset, was performed for medical reasons only and only incidentally resulted in the recovery of evidence for police use. There was no evidence suggesting that the police played a role in the decision whether to operate. They merely asked to be advised when an operation was to be performed, if the defendant and the doctors made the decision to take that route. The doctors' acts in keeping the police notified and in turning the bullet over to them were not the result of official pressure or duress. They were merely praiseworthy acts of citizen cooperation. "[I]t is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." *Coolidge* v. *New Hampshire*, 403 U.S. 443, 488 (1971).

---

[1] The trend of decision has been otherwise with respect to the use of confessions coerced by private persons. See *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680–681 (1975), cert. denied, 425 U.S. 959 (1976).

Commonwealth *v.* Storella.

The defendant cites several cases in which unlawful searches by private individuals have been held to constitute State action because of a degree of involvement, sometimes slight, by police: *State* v. *Becich,* 13 Or. App. 415 (1973); *Williams* v. *State,* 501 P.2d 841 (Okla. Crim. App. 1972); *Stapleton* v. *Superior Court,* 70 Cal. 2d 97 (1968); and, in a different (but arguably related) context, *United States* v. *Price,* 383 U.S. 787, 794 (1966). See also *Byars* v. *United States,* 273 U.S. 28, 33 (1927); *Lustig* v. *United States,* 338 U.S. 74, 78–79 (1949); *People* v. *Tarantino,* 45 Cal. 2d 590, 595 (1955). A crucial element in all those cases was a finding that police participated in or directed the challenged search or seizure. In this case, by contrast, the spent bullet came into the hands of the doctors with no element of participation by or direction from the police. A second crucial distinction between the cases relied on by the defendant and this one is that in those cases the purpose of the challenged search was investigatory. The purpose of the operation in this case, by contrast, was medical; the fact that the doctors knew that the police wanted the bullet was not the reason the operation took place.[2] More in point, therefore, are cases such as *Commonwealth* v. *Tanchyn,* 200 Pa. Super. Ct. 148, 150–154, cert. denied, 375 U.S. 866 (1963), and *Commonwealth* v. *Gordon,* 431 Pa. 512, 517 (1968), cert. denied, 394 U.S. 937 (1969), in each of which the police were permitted to use evidence derived from a blood sample given them by hospital authorities, the said sample being part of a larger sample extracted from the defendant

[2] More distinguishable still is the line of cases involving operations proposed or conducted over the defendant's objections and for the purpose of obtaining evidence, such as *Rochin* v. *California,* 342 U.S. 165 (1952); *Schmerber* v. *California,* 384 U.S. 757 (1966); *Creamer* v. *State,* 229 Ga. 511 (1972), cert. denied, 410 U.S. 975 (1973); *Allison* v. *State,* 129 Ga. App. 364 (1973), cert. denied, 414 U.S. 1145 (1974); *Adams* v. *State,* 260 Ind. 663 (1973), cert. denied, 415 U.S. 935 (1974); *People* v. *Smith,* 80 Misc. 2d 210 (N.Y. Sup. Ct. 1974); *Bowden* v. *State,* 256 Ark. 820 (1974); *United States* v. *Crowder,* 543 F.2d 312, 313–317 (D.C. Cir. 1976), cert. denied, 429 U.S. 1062 (1977).

earlier for purely medical purposes and with no police involvement; and *Webb* v. *State*, 467 S.W.2d 449, 450–451 (Tex. Crim. App. 1971), a case, like this, where doctors operated for purely medical reasons to remove a bullet and then turned it over to the police.[3] In all these cases the evidence was held to have been obtained without violation of the Fourth Amendment because the doctors did not act as agents of the State in acquiring or "seizing" the evidence.

The defendant suggests that the doctors' actions were State actions because G. L. c. 112, § 12A, required that they notify the police forthwith that they were treating a bullet wound.[4] But the notification required by § 12A was not the "search" and "seizure" complained of; the statute imposes no duty on the doctor beyond notification. Even if the statute went further and mandated, for example, that the hospital retain the bullet, when extracted, for use as evidence, it would not follow that the doctor's removal of the bullet and transmission of it to the police would be deemed State action. The point is governed in principle by *United States* v. *Miller*, 425 U.S. 435 (1976), which held that no Fourth Amendment rights of depositors are infringed by statutes requiring banks to keep copies of all checks, deposit slips, and statements and to turn them over to the State for use as evidence in criminal proceedings. "The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." *Id.* at 443. The defendant in the case before us knew the risk. He had been told, specifically, that the bullet, if removed, would be turned over to the police. These considerations

---

[3] See also *Green* v. *State*, 257 Ind. 244, 253 (1971), a bullet removal case close on its facts to the present case; but the defendant in that case waived the Fourth Amendment point by failing to argue it.

[4] The point is mentioned but hardly argued. Indeed, the thrust of the defendant's argument is to the contrary: that the fact that the doctors went beyond the one-time notification requirement of the statute evidences the existence of an agency relationship.

indicate that the judge was probably correct in his further conclusions that, even if the doctors had been acting as agents of the police, the evidence was admissible because (1) the defendant had no reasonable expectation of privacy in the context of the operating room (see *Venner* v. *State*, 279 Md. 47 [1977]), and (2) the defendant had, in effect, consented to the removal of the bullet and its transmission to the police (compare *Lewis* v. *United States*, 385 U.S. 206, 211–212 [1966]; *Hoffa* v. *United States*, 385 U.S. 293, 300–303 [1966]). But as we have concluded that the judge did not err in finding that the doctors were acting as private citizens merely and not as agents for the police in retrieving the bullet, it is unnecessary for us to consider the judge's alternate bases for his denial of the defendant's motion to suppress.

The defendant, relying on *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 57 (1974), contends that the judge erred by refusing to rule that the Commonwealth had the burden of proving a justification for the warrantless search for and seizure of the bullet. The difficulty with the contention is that the defendant failed to sustain his preliminary burden of showing that the police executed a search or seizure. On the judge's findings, the "search and seizure," which in this context can only mean the surgical removal of the bullet, was not done by or for the police, and its transmission thereafter to the police was not a "seizure." "If a transfer is voluntary, then it is not a seizure and the Fourth Amendment's reasonableness standard is simply inapplicable." *United States* v. *Sherwin*, 539 F.2d 1, 8 (9th Cir. 1976).

After the adverse ruling on the motion to suppress, the defendant filed a motion asking for a rehearing in order that the testimony of Dr. McCarthy might be considered. The motion for rehearing was supported by an affidavit of defendant's counsel which was uninformative as to the content of Dr. McCarthy's expected testimony. At the hearing on the motion the defendant's counsel indicated that he hoped to show by Dr. McCarthy's testimony that

he had been in charge or control of the operating room and had not given his consent to the presence of Captain DeSantis therein at the time of the operation. Such a showing would have done more to undercut the defendant's agency theory than to support the defendant's contention that the evidence was obtained by illegal police methods, as it is clear that the presence of DeSantis within the operating room, rather than in the corridor outside, was an immaterial factor in the police's obtaining the bullet. It lay well within the judge's discretion to deny the motion.

*Judgment affirmed.*