### LOUIS Q. PUGSLEY

v.

### PHYLLIS W. PRIVETTE

February 29, 1980.

Record No. 771476.

Present: I'Anson, C.J., Carrico, Cochran, Harman, Poff and Compton, JJ.

*Norman F. Slenker* (*Slenker, Brandt, Jennings & O'Neal*, on brief), for appellant.

*John K. Villa* [*D.C.*] (*David Povich* [*D.C.*]; *Aubrey M. Daniel, III; Williams & Connolly* [*D.C.*], on brief), for appellee.

HARMAN, S.J., delivered the opinion of the Court.

In this case a patient complains that she was operated on by a surgeon without her consent, and she seeks to recover damages for the alleged battery.

Phyllis W. Privette, in the first count of a two-count motion for judgment, claimed that she was entitled to recover damages for the alleged negligence of Dr. Louis Q. Pugsley, Dr. William H. Cooper, and the Fairfax Hospital Association in their diagnosis and treatment of her while she was a patient under their care. In the second count she included by reference the allegations of count one and further al-

leged that an assault and battery was committed on her in that Dr. Pugsley, assisted by Dr. Cooper, operated on her in the Fairfax Hospital after she had been anesthetized by Dr. Heinz Otto Silbersiepe, an anesthesiologist, and Miss Kathleen Marks, a nurse anesthetist, notwithstanding that plaintiff had withdrawn her consent to the surgery performed.

Prior to trial, plaintiff suffered a nonsuit as to Dr. Cooper. At the conclusion of her evidence she was granted a nonsuit as to the hospital on count one. The jury returned a verdict in favor of all remaining defendants on count one and in favor of the hospital. Dr. Silbersiepe, and Miss Marks on count two. It found against Dr. Pugsley on the battery count and assessed plaintiff's damages at $75,000. The verdict was sustained by the trial court, and final judgment was entered.

The issues in this case have been narrowed by the jury's verdict. The defendants denied any liability to the plaintiff for medical malpractice, and the jury found in their favor. This disposed of the issue of alleged negligence by Dr. Pugsley in his treatment of Mrs. Privette. The sole question we consider is the alleged battery on the plaintiff by Dr. Pugsley, and the damages, if any, proximately caused thereby. It is, therefore, unnecessary that we review in detail the voluminous medical testimony given by the numerous doctors who attended the plaintiff.

Mrs. Privette was forty-four years old at the time of trial in February 1977, and resided with her two children in Annandale, Virginia. She is a registered nurse and was employed at the time of the operation by Dr. William Carver Amos, Jr. Her medical history includes an abdominal hysterectomy performed in 1970. Between 1970 and 1974, plaintiff was seen and attended by a number of physicians for various complaints. Among them was Dr. Alan Hall, the chief of surgery at Fairfax Hospital, who performed some minor surgery on plaintiff in 1973, and who was also consulted by Mrs. Privette for pelvic bleeding.

Plaintiff was first seen on February 7, 1974, by Dr. Pugsley, who is an "OB-GYN-Specialist." He recorded her chief complaint as bleeding from the area of the vaginal cuff. Later the defendant examined plaintiff under anesthesia and saw her several times thereafter. On June 13, 1974, plaintiff was advised by defendant that an exploratory laparotomy was necessary because of unexplained bleeding in the vaginal area. An operation was scheduled, postponed, and then rescheduled for August 15, 1974, at which time it was performed in the Fairfax Hospital by Dr. Pugsley, with Dr. Cooper assisting. The anesthesiologist and anesthetist were Dr. Silbersiepe and Miss Marks, respectively.

The surgery involved, among other things, the removal of the patient's ovaries. The operation was complicated by the fact that the ovaries were bound down by endometriosis, a fibrous mass of non-malignant tissue. It was testified that one of the recognized problems that sometimes attend an operation of the type performed on plaintiff is that the surgeon can unintentionally cut or damage the ureter while removing the ovary, and within five to fifteen days a fistula, or small hole, will develop in the ureter, allowing urine to leak into the body cavity and cause internal infection. The ureter is the tube connecting the kidney with the bladder. This problem is more serious if a patient has only one functioning kidney and if the damaged ureter is attached to that kidney. In this event a fistula in the ureter may also cause acute renal failure since the body will no longer be able to excrete urine. During the course of the operation on Mrs. Privette, the left ureter was cut or damaged. Later it was discovered that Mrs. Privette did in fact have only one functioning kidney, and it was to this kidney that the damaged ureter was attached.

Dr. Myron Paul Berger, one of Mrs. Privette's attending physicians, was called in consultation on August 20, 1974. He testified that "looking at everything, that whichever injury occurred to the ureter occurred at the time of the surgical procedure during the surgery." He also testified that such an injury could occur under the best of surgical procedures and techniques, and he was unable to state within reasonable medical certainty that the injury to plaintiff was accomplished mechanically by Dr. Pugsley or whether it resulted from the natural and inherent insult of the procedure itself.

A great number of specialists in various fields attended the plaintiff during her illness and they, together with others who qualified as experts, testified on the question of negligence, an issue with which we are not now concerned. The jury resolved this issue on conflicting evidence. Important to our decision is plaintiff's condition following the operation by Dr. Pugsley. For the first forty-eight hours after surgery there were no apparent complications. Then Mrs. Privette incurred a pulmonary embolism, and she was placed in intensive care. Thereafter her urinary output decreased, and her condition worsened. Four days after surgery plaintiff was critically ill with a presumptive diagnosis indicating kidney failure. Two days later she began passing urine from the vagina, leading to a further diagnosis that a fistula had developed in the left ureter. Dr. Berger, the attending urologist, found Mrs. Privette in a comatose state and said her condition was "ultra-critical," due primarily to sepsis, which is an overwhelming systemic bloodstream infection. A cystoscopy revealed a poorly functioning

left kidney and a non-functioning right kidney, as well as a fistula in the left ureter near the area of the excised left ovary, causing urine to pass into the vagina. Dr. Barry S. Stauch, who also attended Mrs. Privette, and is a specialist in the field of nephrology, concurred with Dr. Berger that the fistula resulted from trauma induced during surgery performed by the defendant. To enable the fistula to heal, Dr. Berger performed a nephrostomy, diverting the flow of urine through a tube inserted through the patient's side into the kidney, a tube which remained until the first of December 1974.

The attending physicians testified that the plaintiff was very near death at times. She remained comatose and in a critical condition for several weeks, but ultimately improved enough to be discharged from the hospital on October 27, 1974. She returned to the hospital on December 1, 1974, for a post-operative check-up and for the removal of the nephrostomy tube in her side. The attending physician anticipated a short stay but, because of complications, Mrs. Privette was not discharged until December 17, 1974.

We think it unnecessary to detail the prolonged and extensive treatment that followed the August 15, 1974 operation. The evidence established that plaintiff suffered intense pain, discomfort, and physical, mental, and psychological injuries, some of a permanent nature. Mrs. Privette was making approximately $8,000 a year at the time the operation was performed. The testimony shows that for the two years thereafter her income was substantially less and that her earning ability had been adversely affected by her experience. Her medical bills were in excess of $30,000. The critical issue in this case is a factual one, and it is whether Mrs. Privette revoked the consent she gave Dr. Pugsley to perform the exploratory laparotomy on her.[1] If so, the defendant committed a battery on the plaintiff, and she is entitled to recover the damages that proximately resulted.

Mrs. Privette, who was referred to Dr. Pugsley by Dr. Hall, said that when she was told by the defendant in June 1974 that she needed surgery, she advised him that she wanted Dr. Hall present when the operation was performed. Her explanation was, "Dr. Hall had done

---

[1] The consent form signed by Mrs. Privette on August 14, 1974, reads as follows:

I hereby authorize *DR. L. PUGSLEY* and/or other members of the Medical Staff of The Fairfax Hospital of his choice, to perform those diagnostic or therapeutic medical and surgical procedures on and to administer the necessary anesthetics to *PHYLLIS PRIVETTE* which in his or their judgment may be deemed necessary. I further authorize The Fairfax Hospital to dispose of any removed tissue or amputated parts.

I certify that the nature of the procedures contemplated have been explained to me by my physician and I understand the purpose of this authorization form.

surgery on me. And I just wanted nothing taken out that didn't need to be, nor did I want anything put in that was not necessary. Dr. Pugsley is a GYN doctor. And so he knows GYN. But I wanted a surgeon present. And so we discussed this." The plaintiff testified that prior to having the operation scheduled for a definite date in August 1974, she called Dr. Hall's office to determine if he "was going to be there, would not be on vacation or the like," and that after being assured of Dr. Hall's availability she said the surgery was scheduled for August 15, 1974, with Pugsley's secretary. Mrs. Privette testified that after the operation was definitely scheduled, she called Dr. Hall's office and advised the receptionist of the date and time. Plaintiff further said that a week before her operation was to be performed, she saw Dr. Pugsley and "told him at that time that I had set it up with Dr. Hall, and Dr. Hall would be available."

Plaintiff was admitted to the hospital on August 14, 1974, at which time the pre-operative procedures were done. On the morning of August 15, 1974, about 9 a. m., Mrs. Privette was taken from her room to the holding area, a place where patients are kept until they are taken into the operating room. The plaintiff said that when Miss Marks, the anesthetist, came into the holding area and started her "I.V." Mrs. Privette asked her "if Dr. Hall were there. And she said she did not know, but that she would check." Plaintiff said that when Dr. Pugsley came in he spoke to her and she asked him "if Dr. Hall were there," and that Dr. Pugsley said that he "didn't know where he was, but that he would look." Mrs. Privette said the next thing that occurred was that Miss Marks and another nurse took her into the operating room where she was transferred to the table. She testified that while this was occurring, "there was a discussion going on behind me, a voice of a woman that I cannot identify, and Dr. Pugsley. And the discussion was to the effect that I don't know where he is. He's not here. And then Dr. Pugsley walked around . . . and told me that Dr. Hall was not available, that he was in one of the other suites doing surgery. And I said, 'I do not want to be put to sleep until he gets here.' And at that moment I felt the sodium pentothal hit my vein, and I remember nothing else."

On cross-examination Mrs. Privette was positive that she advised Dr. Pugsley on numerous occasions, prior to the morning of August 15, 1974, "about Dr. Hall being present at the time of surgery." She further stated that when an intern in the hospital came to perform a physical on her prior to the operation, she told him that Dr. Hall was to be present at the surgery.

Miss Marks' version of what occurred in the holding area is that

Mrs. Privette told her that "she had spoken to him [Dr. Hall] yesterday. And he told her that—that he would be there with her prior to going into surgery." Miss Marks said that Dr. Hall was not present and that she and the charge nurse tried to find him but were not successful. Miss Marks testified that the plaintiff told her in the holding area that she didn't want to be put to sleep until Dr. Hall was there. She further said that she moved the plaintiff to the operating room and put her to sleep because Dr. Pugsley so ordered.

Mrs. Holley, a friend of the plaintiff, testified that Mrs. Privette had told her before going to the hospital about Dr. Hall's intention to be present at the operation. She stated that the plaintiff called her the night following the operation and told her that Hall had not been present and that she had objected, cried, and screamed before being put to sleep. Mrs. Holley also testified that while she was present Dr. Pugsley told the plaintiff's daughter that "apparently the ureter had been nicked during surgery, . . ." Mrs. Holley also described Mrs. Privette's near-death condition after surgery and her permanent change of personality.

Dr. Hall testified that he did not commit himself to plaintiff to be present at the surgery but that he had said he would be available if necessary during the surgery. He said that Dr. Pugsley "probably told me that he was going to operate on her, and I was aware of it. And as I say, I was available on a p.r.n. or as necessary basis." When asked if Mrs. Privette was not anxious to be assured that he would be present when the operation was performed, Dr. Hall responded, "Available but not present, only if necessary. That commitment was made, but not to be in the operating room to watch another surgeon operate." Dr. Hall did admit that he recalled "that she wanted me there. And I told her I would be available if needed." He also admitted that his calendar for August 15, 1974, did show a notation thereon, made by his nurse, of Mrs. Privette's scheduled operation and the time thereof, and that the notation was there "to prevent that I [Dr. Hall] would be committed to doing something else at the same time. . . . [W]e left the space open where if I was needed in the operating room, I would be available." He said no one ever called him.

Dr. Pugsley testified that at some time prior to the operation, "Mrs. Privette indicated to me that she wanted to say hello to Dr. Hall while she was in the hospital," but that nothing was said to him about Dr. Hall being present at the time of surgery. He said that he first saw plaintiff on the morning of the surgery when she was in the holding area and that after they had exchanged "good mornings," plaintiff asked him if he had seen Dr. Hall. He said he told her that he had

not and she asked, "Can you find him?", to which he replied, "[w]ell, I don't know if he's here. I certainly will go and look and see if I can find him if he is here." He said he did look for Dr. Hall in the surgeon's dressing room but did not find him. In essence Dr. Pugsley testified that he gathered that all that Mrs. Privette wanted of Dr. Hall was to say "hi." [2]

■ This case is controlled by those most elementary principles of law which govern an action for assault and battery. "The law is so jealous of the sanctity of the person that the slightest touching of another, . . . if done in a rude, insolent or angry manner, constitutes a battery for which the law affords redress. . . ." *Crosswhite* v. *Barnes,* 139 Va. 471, 477, 124 S.E. 242, 244 (1924). It is well established that, given the proper factual conditions and circumstances, a patient can maintain against a physician an action based on assault and battery for acts arising out of the physician's professional conduct. The relationship between physician and patient is a consensual one and "[a] surgical operation on the body of a person is a technical battery or trespass unless he or some authorized person consented to it." 61 Am. Jur.2d *Physicians, Surgeons, Etc.* §155 (1972). An unauthorized operation is a wrongful and unlawful act for which the surgeon will be liable in damages. Consent to an operation may be express, and under some circumstances may be implied or presumed. *See* 61 Am. Jur.2d *Physicians, Surgeons, Etc.* §158 (1972). Such consent to an operation may also be withdrawn, if timely and unequivocally done, thereby sub-

---

[2] Typical of the defendant's testimony regarding Dr. Hall's involvement are the following exchanges between him and counsel:

Q. What is it that she told you, or what did she speak with you about? What did she say?
A. Well, she wanted to know if Dr. Hall was there, and she did remind me about taking care of the condyloma.
Q. She had spoken with you earlier about Dr. Hall being there, didn't she?
A. Um-hum.
Q. Now, when you say she wanted to know if Dr. Hall was there —
A. (Interposing) Um-hum.
Q. (Continuing) — did she indicate to you why she wanted to know if he was there?
A. No, she did not.

\* \* \*

Q. Didn't you testify earlier that she said she wanted to say hello to Dr. Hall?
A. Um-hum.
Q. Didn't you testify that she said that to you when you first saw her in the holding area?
A. Yes.
Q. So she did say she wanted to say hi?
A. Yeah.

jecting the surgeon to liability for battery if the operation is continued. *See Mims* v. *Boland,* 110 Ga. App. 477, 138 S.E.2d 902 (1964).

■ It is conceded that Mrs. Privette signed the necessary consent for Dr. Pugsley to perform an operation on her. As heretofore observed, the critical issue of fact before the jury was whether or not this consent was revoked by the plaintiff on the morning the operation was scheduled to be performed. If so, a battery was committed on her.

Mrs. Privette testified positively that Dr. Pugsley was advised, and he understood that she wanted and expected Dr. Hall to be present when Dr. Pugsley performed the exploratory laparotomy on her. This desire on her part was not only communicated to Doctors Pugsley and Hall but obviously was known to those connected with the offices of these two physicians. Plaintiff testified that on the morning of the operation she inquired of both Dr. Pugsley and Miss Marks if Dr. Hall was present and said that she did not want to be put to sleep until Dr. Hall was present. Miss Marks admitted that this statement was made. The plaintiff further testified that when she overheard a conversation in the operating room to the effect that Dr. Hall was not available, she then told Dr. Pugsley that she did not want to be put to sleep until he [Hall] got there.

The jury believed the testimony of the plaintiff, which it had a right to do. It rejected the defendant's testimony that the only reason Mrs. Privette wanted Hall present was to say "hi" to him, finding it unbelievable that, with surgery scheduled to be performed in a few minutes, three of the principals involved, including the defendant and the charge nurse, were running around the hospital looking for the chief of surgery so that he could say "hi" to their patient. Neither was the jury compelled to believe that a busy surgeon, as is Dr. Hall, would have set aside and blocked out on his calendar the time during which Mrs. Privette was scheduled for surgery without there having been some prior arrangement involving his presence at the operation.[3]

There was evidence from which the jury could have found that Mrs. Privette made the necessary arrangements for Dr. Hall to be present, and expected his presence when her operation would be performed. If it so concluded, the jury had the further right to believe that, because of Hall's absence, Mrs. Privette did in fact revoke her consent for Dr. Pugsley to perform the operation, and that he, nevertheless, knowingly

---

[3] During the trial in the court below counsel for plaintiff proffered the testimony of Mrs. Claudia Bain, who was Dr. Hall's receptionist, and represented that she would testify, *inter alia,* that the arrangements for Dr. Hall to be present were made through her, but that Dr. Hall was reluctant to appear because he did not feel that Mrs. Privette's medical insurance would pay his fees. The lower court did not permit the introduction of the testimony.

performed it without her consent and contrary to her will. Hence a battery was committed for which he was liable.

It is immaterial to the issue of battery that the jury found that the operation was not negligently performed. And it avails little to argue now that no good purpose would have been served by Dr. Hall's presence, or that had Dr. Hall been present the same operation would have been performed and the same complications would have arisen. It was Mrs. Privette's body on which the operation was to be performed, and the decision was one peculiarly for her to make. The fact is that Mrs. Privette wanted Dr. Hall present, and he was not there. The jury has found that because of this the consent for the defendant to operate had been revoked by the plaintiff. The hazard to a physician of performing an operation without the consent of the patient is dramatically illustrated by this case. Had Mrs. Privette's recovery been an uneventful one, the action most likely would not have been brought. But the recovery was anything but uneventful, and this was the risk the defendant took when he operated without consent. There were warning signals in the holding area of the Fairfax Hospital on the morning of August 15, 1974—signals which should have alerted the defendant to the fact that he had a problem with his surgical patient which he could only resolve in one of two ways: by having Dr. Hall present or by cancelling the operation. He did neither.

The verdict of the jury in favor of Mrs. Privette, upon which the trial court entered judgment, settles all conflicts of testimony in her favor and entitles her to all just inferences deducible therefrom. Fortified by the jury's verdict and the judgment of the court, she occupies the most favored position known to the law. *Tri-State Coach Corp.* v. *Walsh,* 188 Va. 299, 49 S.E.2d 363 (1948).

The defendant argues that the jury should not have been allowed to consider the pulmonary embolism and the intracranial bleeding as a complication of the surgery. Defendant also says that the court should not have allowed the plaintiff to prove through W-2 forms the amount that she earned in the period after her surgery. Plaintiff responds that the evidence shows that the embolism and bleeding are recognized complications of all surgery and would not have occurred but for the surgery. The purpose of introducing into evidence the W-2 forms was to show Mrs. Privette's reduced income following the operation, a fact about which there was testimony. However, the evidence is overwhelming that the all-pervasive complications, which accounted in large measure for plaintiff's damages, are those that resulted from the injury to the ureter. Since we believe the admission of the complained of testimony could not have altered the ultimate outcome of

the case or had any material effect on the amount of the verdict, we hold that any error in its admission was harmless.

■ The jury was fully instructed as to what elements it should consider in determining the damages suffered by the plaintiff in event it found the defendant guilty of negligence, or of a battery, or of both. The jury has determined that the injuries received and ill effects sustained by the plaintiff were proximately caused by the battery. As we observed in *S & C Co.* v. *Horne,* 218 Va. 124, 131, 235 S.E.2d 456, 461 (1977), "[u]nless there is no evidence to support a finding of proximate cause or the evidence leaves no room for reasonable minds to differ, proximate cause is a question of fact to be determined by juries rather than judges." The record abounds with testimony which demonstrates conclusively that the amount of the verdict was not excessive to compensate plaintiff for the ill effects she suffered and for her monetary loss which followed and flowed from the battery, *i.e.,* the operation. The amount is not so large as to evince passion, prejudice, partiality, or corruption in the jury.

■ The defendant also complains that the verdict is inconsistent in that the jury found in favor of Miss Marks, a co-defendant below. There is no testimony that the complications suffered by the plaintiff were the result of the anesthesia administered by Miss Marks. Further, there is no evidence that Miss Marks was privy to the arrangement between Dr. Pugsley and his patient. The first intimation that Miss Marks had of Dr. Hall's involvement occurred in the holding room just minutes before plaintiff's operation was scheduled. The jury might have found, in view of the time element and the limited information which Marks had, that the evidence was insufficient to show that the nurse was properly alerted to Mrs. Privette's withdrawal of consent to the operation. More to the point, however, there is no showing that Marks was the servant, agent, or temporary agent of Dr. Pugsley. *Whitfield* v. *Whittaker Mem. Hospital,* 210 Va. 176, 169 S.E.2d 563 (1969). On the contrary, Marks testified that she was employed by the hospital. Plaintiff also had alleged that Marks and Dr. Silbersiepe were under the supervision and control of the Fairfax Hospital *at all times.* This is not a case where a master and servant are being sued for the same act of negligence and where a verdict for the servant will exonerate the master. The surgeon and the nurse here performed separate, independent, and distinct acts, and no claim was made or any testimony introduced to show agency or control of the one by the other. This case does not involve a question of derivative or vicarious liability and is not one of inconsistent verdicts.

■ Defendant also contends that the court erred in granting an

instruction which told the jury that it was the duty of the defendant surgeon to continue his services to the patient as long as they were necessary. While we agree there was little evidence to support an "abandonment" instruction, any error in giving the instruction was harmless, the jury having found for the defendant on the negligence count.

It is our conclusion that the judgment of the court below should be

*Affirmed.*