## Richmond

### ROBERT CLYDE CRAFT

### V.

### COMMONWEALTH OF VIRGINIA

August 28, 1980.

Record No. 791369.

Present: I'Anson, C.J., Carrico, Harrison, Cochran, Poff, and Compton, JJ., and Harman, S.J.

*Alan L. Arey* for appellant.

*Alexander E. Conlyn, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

HARRISON, J., delivered the opinion of the Court.

The defendant, Robert Clyde Craft, was convicted of attempted robbery and sentenced to serve a term of ten years in the penitentiary. His appeal questions what he alleges was a warrantless seizure of his clothing, and of a bullet removed from his body, and their introduction in evidence at his trial.

On January 9, 1979, about 7 p.m., C. L. Johnson, a Pittsylvania County merchant, closed his store and started across a highway to his home. He had in his possession a cigar box which contained approximately $500. He was also carrying a .32 caliber revolver. En route he was attacked by an unknown male assailant who threw a bedspread over Johnson's head and knocked him to the ground. Johnson testified that while the robber was "grabbing for my money box," he noticed that the man wore an "old flowered shirt." Johnson placed his revolver in the robber's stomach during the struggle and fired twice. The man then got up and ran. The only description Johnson could give of his assailant was that he stood over six feet tall. The defendant is six feet three inches tall.

The attempted robbery was reported to the County Sheriff's Department. The victim was interviewed at the scene by Lt. H. L. Gatewood, and he gave the officer his revolver in which there were four unspent and two spent shells. While conducting their investigation, Gatewood and Deputy Sheriff Tom T. White were notified that a man suffering from a gunshot wound had been admitted to Memorial Hospital in Danville. The officers went to the hospital and found the defendant in the emergency room. Gatewood testified that Craft told him that he had been shot by someone in Danville but did not know on what street it occurred, or by whom he was shot, and that he had walked to the hospital. The officer said at that time Craft was lying on a stretcher, undressed from the waist up, and that Dr. John Stoneburner and a nurse were administering first aid treatment and preparing Craft for x-ray examination and surgery. Both Gatewood and White testified that Dr. Stoneburner asked if the officers wanted Craft's clothing and when they told him they did the doctor gave them the clothing in a brown paper bag. Craft, testifying at the suppression hearing, identified the clothing in the bag, including a silk flowered shirt and a jacket, and said that he was wearing them when he was shot. An examination of the articles revealed two bullet holes in the shirt and one in the jacket.

Deputy Sheriff White testified that while he and Gatewood were in the emergency room, Dr. Stoneburner asked them if they wanted him to save the bullet for them and that when they said "yes," Stone-

burner replied, "It would probably be tomorrow or the next day or so before [they] could come and get the bullet." Stoneburner testified that when he removed the bullet from the defendant he delivered it to Betty Burnett, the circulating nurse in the operating room. Burnett said that she locked the bullet in the narcotics box located in the nurse's station in the operating room and the following morning delivered it to Dr. Jose Estevez, the hospital pathologist. Dr. Estevez explained that the hospital pathologist usually takes custody of all the tissues or objects removed from any patient who enters Memorial Hospital. He said that he delivered the bullet on the morning of January 10th to Deputy Sheriff White, who took it, the defendant's jacket and shirt, and Johnson's pistol and spent cartridge to the state's Bureau of Forensic Science for examination and analysis. James Edward Hamby, who qualified as an expert, testified that the bullet removed from the defendant's body was fired from Johnson's revolver. He further stated that the bullet which penetrated the jacket had been fired from a revolver which was placed directly against the jacket.

Dr. Stoneburner testified that he examined Craft and that X-rays were taken, laboratory work was done, and "appropriate surgical therapy" was carried out during which he removed the bullet in controversy. He said the operation occurred shortly after defendant's admission to the hospital, probably within an hour and a half. Dr. Stoneburner also said that he had no recollection of having given any clothing to Gatewood and White. When asked about the clothing worn by the defendant when he saw him, the doctor responded: "Sorry, I—he was as I recall on the examining table in the emergency room and I really don't recall. My vague impression would be that he had on pants and no shirt. I really am quite vague on that." Stoneburner further testified that the officers asked if the patient was going to have surgery and requested that "[i]f a bullet was removed . . . could it be turned over to them. They wanted to have it." The doctor said that he took no "special steps" to preserve the bullet because of the request made by the police, its preservation being standard procedure in gunshot cases.

Craft testified at the suppression hearing and again upon his trial that he had no recollection of the events that occurred on the night he was shot, or of any of the events that allegedly occurred in the emergency room of Memorial Hospital.

We find no merit in defendant's claim that the clothing, which was introduced in evidence without objection, was not properly iden-

tified as his clothing. Johnson testified that his assailant wore a flowered shirt and that he shot the man twice in the stomach. The shirt introduced in evidence is a flowered shirt, and it has two bullet holes in it. Lt. Gatewood testified, without objection, that the shirt was given to him in the emergency room of the hospital on the night of the shooting and that it belonged to Craft. The trial court determined that it was admissible in evidence. Clearly the shirt was adequately identified and properly admitted in evidence. Its evidentiary weight was a matter for the jury.

■ Neither is there merit in the defendant's contention that Dr. Stoneburner, in removing the bullet from the defendant, was acting as an agent of the police. When Craft voluntarily presented himself in the emergency room of the hospital he impliedly consented to be given necessary medical attention. *See Pugsley* v. *Privette*, 220 Va. 892, 893, 263 S.E.2d 69, 74 (1980). There is no evidence suggesting that the police played a role in the decision made by the surgeon to operate and to remove the bullet from Craft's body. The operation was necessitated by good medical practice. That was its sole purpose. It did not involve an impermissible intrusion into defendant's body. The fact that the police wanted the bullet and that Dr. Stoneburner gave it to them was not the reason the operation took place. There was no "search" of defendant's body for the bullet, or "seizure" of the bullet by the doctor as an agent of the police.

■ Defendant's reliance on *Morris* v. *Commonwealth*, 208 Va. 331, 157 S.E.2d 191 (1967), is misplaced. There, the officers did seize a defendant's clothing. Morris was admitted to a hospital in Harrisonburg suffering from a gunshot wound. He was treated and assigned to a private room. On the following day police officers, without a lawful search warrant and at a time when Morris was under sedation and asleep in his room, requested a nurse on duty to give them Morris' clothes. She took the clothes from a wardrobe in Morris' room and turned them over to the officers. We held that no exceptional circumstances existed to justify the seizure of Morris' personal effects from his room. This is in marked contrast to the background of the instant case. Here defendant was in the emergency room of a hospital, a place frequented not only by doctors, nurses, patients, hospital personnel, and police officers, but also by friends and relatives of persons being treated. A person admitting himself to an emergency room has little expectation of privacy. The officers did not go to Memorial Hospital to search the defendant or to seize any of his belongings. They were investigating an attempted

robbery in which it had been reported that the robber had been shot. The removal of the defendant's clothing by hospital personnel was incident to his examination and treatment. Likewise the bullet was removed from defendant's body during the performance of "appropriate surgical therapy" by the attending surgeon. The defendant had no property right in the bullet. No search by the officers was required or effected. It was not necessary because the clothing and bullet were not hidden or concealed. The articles lawfully came into the possession of Dr. Stoneburner and, under the circumstances of this case, there was no reason why they should not have been delivered to and received by the officers.

In *Commonwealth* v. *Storella*, 375 N.E.2d 348 (Mass. App. Ct. 1978), the defendant also objected to the action of a surgeon, who removed a bullet from his body, in turning the bullet over to the police and claimed that in so doing the physician was acting as an agent of the police and in violation of defendant's Fourth Amendment rights. The court held that the defendant was not entitled to suppression of the bullet. It found that its surgical removal was necessitated by good medical practice, that it was performed for medical reasons, and that nothing suggested that the police played any role in the decision to operate. The court said:

> One of the factual conclusions on which the judge predicated his denial of the motion to suppress was that the doctor who removed the bullet and turned it over to the police was not acting as an agent of the police but merely as a private citizen cooperating with the police by turning evidence of crime over to them. It has long been settled that the Fourth Amendment to the United States Constitution applies only to searches and seizures taken by or at the direction of the State; and, consequently, evidence obtained illegally by private parties and turned over to the police is not obtained in violation of the Fourth Amendment. *Burdeau* v. *McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). The judge's finding concerning lack of agency is therefore dispositive of the case, assuming that it was warranted by the evidence and involved no misapplication of constitutional principles.

*Id.* at 502, 375 N.E.2d at 350-51. *See also State* v. *Turner,* 101 Ariz. 85, 416 P.2d 409 (1966); *People* v. *Abdalla,* 70 Mich. App. 697, 247 N.W.2d 332 (1976); *Luallen* v. *State,* 2 Tenn. Crim. App. 329, 453 S.W.2d 453 (1970).

In *Webb* v. *State,* 467 S.W.2d 449 (Tex. Crim. App. 1971), the defendant claimed the removal of a bullet from his body and its subsequent use by the police constituted a search prohibited by the Fourth Amendment of the United States Constitution. The court disagreed, holding:

> The main thrust of appellant's argument is that he should have been warned that the doctors would turn over the bullet to the police authorities. The evidence conclusively shows that this operation was not performed for the purpose of securing evidence for the police. We know of no rule of law which prohibits an individual from submitting to police officials objects which are lawfully in his possession, and the bullet was lawfully obtained from the appellant. We have, in the case at bar, no deception in regard to the reason for removal of the bullet, as was involved in *Graves* v. *Beto,* 424 F.2d 524 (5th Cir. 1970). We have been unable to find any cases in support of appellant's contention.

*Id.* at 451.

■ We find no violation of defendant's rights under the Fourth Amendment of the Constitution of the United States or Virginia Code § 19.2-59. The defendant had impliedly consented to needed medical treatment. The removal of his clothing and the removal of the bullet were necessary incidents thereof. As evidence of criminal agency the clothing and bullet were seizable objects, and under the facts of this case were appropriate objects to be voluntarily surrendered by the doctor who was in lawful control thereof. *Ritter* v. *Commonwealth,* 210 Va. 732, 173 S.E.2d 799 (1970).

An analysis of the issues and the authorities in connection therewith discloses no reversible error in the judgment of the lower court. Accordingly, it is

*Affirmed.*