Filed 10/22/15  P. v. Steen CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CORDARRYL STEEN,<br><br>Defendant and Appellant. | A139526<br><br>(Alameda County<br>Super. Ct. No. 168348) |

After a jury trial, defendant Cordarryl Steen was convicted of first-degree murder of Tuan Huu Hoang (Pen. Code, § 187, subd. (a).[1])  The jury found not true related special allegations that defendant personally discharged a firearm (§ 12022.53, subd. (d)), and defendant, as a principal, was armed with a firearm (§ 12022, subd. (a)(1)).  In a separate proceeding, the court found true allegations that defendant had served two prior prison terms within the meaning of section 667.5.  At sentencing, the court struck the prior prison term allegations (§ 1385) and imposed a term of 25 years to life. [2]

On appeal, defendant raises three contentions of which we conclude two are without merit.  Specifically, we reject defendant's argument that a reversal is required because he was convicted on a legally impermissible theory of murder.  We also find that

---

[1]    All further unspecified statutory references are to the Penal Code.

[2]    In a separate case, the court imposed a four-year concurrent term for a conviction for violating Health & Safety Code section 11352, and imposed but stayed a four-year term for a conviction for violating Health & Safety Code section 11351.5.  No issues are raised on appeal concerning the separate case.

the trial court properly denied defendant's motion to suppress a bullet surgically removed from him and police observations and analyses done on the bullet. However, we agree with defendant that he is entitled to a new hearing on his renewed motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). Accordingly, we shall conditionally reverse the judgment and remand for a new *Pitchess* hearing.

## FACTS

The District Attorney filed an information charging defendant with one count of first-degree murder of Tuan Huu Hoang (§ 187, subd. (a)), together with related special allegations that during the commission of the murder defendant personally discharged a firearm (§ 12022.53, subd. (d), and defendant, as a principal, was armed with a firearm (§ 12022, subd. (a)(1)). The charge and related firearm-use special allegations arose from an incident that occurred in the late hours of December 18, 2010, and into the early morning hours of the next day. At a jury trial, the following relevant evidence was elicited.

The victim, Hoang, lived together with Nghiep Ton and Luyen Pham, as tenants at a residence on International Boulevard in Oakland. On the evening of December 18, all the tenants were present at the residence. Hoang's friend, Maurice Howard, was also there to view Hoang's new medical marijuana growing operation. Howard and Pham decided to pick up some crack cocaine. As Howard opened the front door to leave, three African-American men tried to force their way inside. Howard got the door shut, but he could not lock it. The three men rushed inside and "a gun battle ensued." During the gun battle, two of the men who had entered ran out of the house. The third man, wearing a baseball cap, and Hoang, continued to struggle and exchanged gun fire. The third man turned and began to run away while Hoang was in a prone position on the floor. As he fled, the third man turned around "to fire," grab[bed himself] in his mid region somewhere," and fired, hitting Hoang in the head, [3] and Hoang then fired "a last shot."

---

[3] Hoang died a few days later on December 22. A forensic pathologist testified that Hoang died from multiple gunshot wounds, including a wound to his thigh (a through and through wound) and a wound to his head (an entrance wound).

The gunshot fire illuminated the third man's profile. Howard got a clear view of the man's profile, and in court, Howard identified the third man as defendant.[4] Following the shooting, defendant fled the residence.

Ton called 911. Before the police arrived, Howard retrieved Hoang's .40-caliber pistol from the floor. Howard went outside and put the gun in the wheel-well of a car that was parked on the street. The police, however, saw Howard secrete the gun and recovered it. The gun was loaded with six live rounds in its magazine. Inside the house, the police found Hoang lying on his side in the front room. A couple of bullet casings and a bullet were found under Hoang. Five spent bullet casings were recovered: one .40-caliber casing and four .25 caliber casings.

Later that morning on December 19, defendant's girlfriend, Dasai Harris, learned that he had sustained a gun shot wound.[5] She drove defendant to a hospital in San Leandro, and defendant was later taken to Eden Hospital. During surgery at Eden Hospital, a doctor extracted a .40-caliber bullet from defendant's body. A ballistics

---

[4] At trial, Howard testified that following the shooting and at the police station, he was shown photographs of potential suspects, including one of defendant, but none of the photographs were shown in profile. Howard did not identify defendant at the police station because he wanted to impose "street justice." Howard also admitted that he had previously testified at the preliminary hearing that he was not 100% certain that defendant was the shooter. However, at that earlier hearing defendant had been asked to stand up and turn around three times, and once Howard saw defendant's profile, Howard was 100% positive that defendant was the shooter. At trial Howard testified that he did not need to have defendant again stand up and show him his profile in order to identify him as the shooter.

[5] Several months after the shooting, the police interviewed defendant's acquaintance, Ronald Smith. The interview was recorded on a DVD and played at trial. During that interview, Smith said he was not with defendant when defendant got shot. Smith was in his car around the corner on E Street in Oakland. Following a call informing him that defendant just got shot, Smith picked up defendant who was lying on the sidewalk on 93rd Street in Oakland. Defendant said he had been shot in the vicinity of 91st Street to 92nd Street in Oakland. Harris got into Smith's car and drove them to the hospital. After the tape was played, Smith testified that the statement he gave to the police was false. He claimed that someone told him what to say to the police. At trial, Smith denied he picked up defendant and took him to the hospital. He testified that he went to the hospital, but not with defendant.

expert testified that the bullet was the same caliber as the gun that the police had retrieved from the car wheel well. But, the expert could not say definitively whether the bullet was fired from that gun. All of the .25-caliber casings found at the scene had been fired from the same gun.

Several months after the shooting defendant was arrested for murder and he was questioned by Oakland Police Sergeant Sean Fleming. The interview was recorded on a DVD and played for the jury. During the interview, defendant said that on the day he was shot he lived with his mother in an apartment building on "Gardner Street" in Hayward. He also reported that on the day he was shot another man had also gotten killed on Gardner Street. [6] Defendant stated that as he was walking home he "[g]ot caught in the crossfire" shooting between people coming out of his apartment building and people in a passing car. Defendant was taken to the San Leandro Hospital by a man who lived in the apartment next door to defendant's apartment. On the way to the hospital, defendant called Harris and told her that he had been shot. Defendant denied he had been shot "on 90th," claiming he "wasn't over there." Defendant also denied that he had killed anyone.

## DISCUSSION

### I. Sufficiency of Evidence to Support First Degree Murder Conviction

In this case the jury was instructed on the theories of first-degree murder (premeditation and deliberation) and felony murder. Defendant makes no substantive argument challenging the sufficiency of the evidence to support a conviction on the felony-murder theory. He contends only that there was insufficient evidence as a matter of law to support a verdict on the premeditation and deliberate murder theory. His

---

[6]     The transcript of the recording of defendant's interview indicates that defendant spelled the street where the shooting took place as "Gardner." The records administrator for the Hayward Police Department testified that on December 18 and 19, 2010, there were no calls regarding a shooting on "Gardner Street" in Hayward. Police Sergeant Fleming similarly testified that there was no record of anyone being shot on Gardner Street in Hayward. District Attorney investigator testified that he was not able to locate and was not aware of any Gardner Street in Hayward.

4

argument is premised on the assumption that the jury's "not true" findings on the personal firearm-use allegations demonstrates that the jury found he was not the actual shooter. Not so. Howard's trial testimony, during which he identified defendant as the shooter acting under circumstances evidencing the necessary premeditation and deliberation, constitutes substantial evidence supporting a guilty verdict on that theory. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407, citing Evid. Code, § 411 and *People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508 [testimony of one witness is sufficient to support verdict]; see *People v. Smith* (2005) 37 Cal.4th 733, 741 [the act of shooting toward a victim at close range in a manner that could inflict a mortal wound is sufficient to support an inference of intent to kill and is not dependent on a further showing of any particular motive to kill the victim]; *Ibid.* [" ' "the fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance" ' "]; *People v. Arias* (1996) 13 Cal.4th 92, 162 ["if the jury found defendant's use of a lethal weapon with lethal force was purposeful, an intent to kill could be inferred, even if the act was done without advance consideration and only to eliminate a momentary obstacle or annoyance"].) "[T]he jury's 'not true' finding on the personal firearm use [allegations] may be logically inconsistent with a finding that defendant was the direct perpetrator of the charged offense[], but, . . . the inconsistency is not grounds for reversal" as there was substantial evidence to support the verdict based on the theory of premeditation and deliberation murder. (*People v. Miranda, supra*, at p. 407.)

Because the record does not reflect that the jury was presented with an impermissible theory of murder, defendant's claim of error fails.

## II. Denial of Motion to Suppress Bullet Surgically Removed from Defendant and Police Observations and Analyses Done on the Bullet

### A. Relevant Facts

Before trial defendant filed a written motion to suppress (1) the bullet taken from his body during a surgical procedure performed several weeks after the shooting and (2) the police officers' observations of the bullet after its removal and the results of any

analyses conducted on the bullet. The motion was based on defendant's assertion that the bullet had been illegally seized without a warrant in violation of his Fourth Amendment rights. The prosecution opposed suppression on the grounds that the surgical removal of the bullet was not a governmental search and defendant did not have a reasonable expectation of privacy in the removed bullet.

The following evidence was presented at the hearing on the motion to suppress evidence. Oakland Police Sergeant Sean Fleming testified that at about 2:00 a.m. on December 19, he was at Eden Hospital investigating an unrelated homicide. He received a radio call informing him that Oakland police officers had responded to the scene of a shooting on International Boulevard in Oakland. He was later informed that a man, subsequently identified as defendant, had walked into San Leandro Hospital. Defendant had sustained a gunshot wound in his chest.

Thereafter, at 3:49 a.m. on December 19, Fleming went to the location of the International Boulevard shooting. Inside the residence, Fleming observed two pools of blood in the room where the shooting had occurred, about four feet from the location where the victim's body lay after he had been shot. Fleming also observed two shell casings, which he recognized as two different calibers; however, only one bullet and one gun had been recovered at the scene. Because two different bullet casings and only one bullet had been found, Fleming believed that at least two people were involved in the shooting and that one of the shooters had fled the scene. While at the scene of the shooting, Fleming received updates on defendant's condition and inconsistent information as to where defendant was located before he was brought to San Leandro Hospital.[7] Defendant's girlfriend reported that she had picked up defendant in the area of

---

[7] San Leandro Police Officers Timothy Perry and Michael Benz testified regarding their investigation of the shooting while defendant was at San Leandro Hospital. At the hospital, the officers spoke with both defendant and Dasai Harris, who identified herself as defendant's girlfriend. Defendant said that the shooting incident took place in Hayward, and no other people were involved or injured. According to Perry, Harris initially said that defendant had called her and said that he had been shot and needed to be picked up at 103rd and East 14th in Oakland. Harris later said that she was sitting in a

6

103rd Avenue, which was close to the scene of the shooting. Fleming also heard a radio report that defendant had been picked up in the area of "98th and Edes or E Street," and not 103rd Avenue. Based on this conflicting information, and his own observations at the shooting scene, Fleming believed defendant was involved in the shooting. Fleming also learned that defendant had been moved from San Leandro Hospital to Eden Hospital.

In the days following the shooting, Fleming learned that defendant remained hospitalized at Eden Hospital. Although Fleming was aware of defendant's condition and location, he did not ask that the bullet be removed from defendant's chest, or that he be informed if the doctors decided to remove the bullet. On January 4, 2011, at about 2 p.m., Fleming called a nurse at Eden Hospital to check on defendant's condition. The nurse stated that defendant was still at the hospital and his condition was improving. The nurse reported that the bullet had not yet been removed but that the doctors "just happened to be planning to remove the bullet later" that day.[8] Fleming sought no further information about the status of the bullet; the nurse was the first one to mention it. Fleming was not aware of the procedure that would be used to remove the bullet. And, he did not know why the doctors chose to remove the bullet on the day he called to check on defendant's condition. Less than an hour after his initial call to Eden Hospital, Fleming was called by a hospital nurse and told that a bullet had been removed from defendant's body, and the bullet had been placed in a secure evidence locker at the hospital. Again, Fleming did not ask the hospital nurse to set aside the bullet. However, when she told him she was going to do so, he said he would send an officer to pick up the

friend's car on 98th and "E" in Oakland when a man, identified as "Rod," drove up and told her that defendant had been shot, defendant was in the back seat of Rod's car, and Harris needed to drive both men to the hospital. Harris got out of her friend's car, went into Rod's car and drove the men to the hospital. According to Benz, Harris said she had come from "98th and Edes." Following defendant's transfer to Eden Hospital, officers from the Oakland Police Department took over the investigation.

[8] Contrary to Fleming's hearing testimony, the parties stipulated that a staff member of the district attorney's office had reported that before the suppression hearing, Fleming stated that after his initial phone call with the hospital nurse he did not know that the doctors were planning to remove the bullet that day.

bullet that same day. Later that day, Fleming sent an Oakland Police Department technician to Eden Hospital to retrieve the bullet. Fleming testified that he did not obtain a warrant before arranging to retrieve the bullet.

Following arguments by counsel, the trial court denied the motion to suppress evidence. The court found that the record was clear that the removal of the bullet was not done at the request or direction of the police. [9] The court further found that once the hospital staff had taken possession of the bullet, the police technician's retrieval of the bullet did not violate any expectation of privacy that defendant had in the bullet, and therefore, the police did not need to obtain a search warrant before retrieving the bullet from the hospital.[10]

### B.    Analysis

On appeal defendant contends the bullet  - removed during a surgical operation and left in a secure evidence locker for later retrieval by the police  - should have been suppressed for two reasons: the hospital staff were acting as agents of the police, or alternatively, the police technician's warrantless seizure of the bullet from the secure evidence locker was illegal under the Fourth Amendment. We conclude defendant's contentions are unavailing.

---

[9]    By its ruling, the trial court implicitly rejected defense counsel's arguments that the evidence elicited allowed for the drawing of an inference that the hospital staff were acting as agents of the police on the following grounds:  (1) "[t]here's been no evidence presented to this court" that the surgical procedure to remove the bullet "had an independent medical purpose;" and (2) on the day that Sergeant Fleming inquired about the bullet, "there is suddenly a procedure . . . in which the bullet is removed from Mr. Steen," and thereafter the hospital sets aside the bullet, "attempting to preserve some chain of custody" for the police, and then notifies the police department that the bullet can be picked up.

[10]    By its ruling, the trial court implicitly rejected defense counsel's argument that "the results" of any police "observations," including "ballistics examinations" on the bullet and attempted "DNA examinations on the bullet," should be suppressed because once the bullet was placed in the hospital's secure evidence locker there were no exigency circumstances excusing the police from securing a warrant before retrieving the bullet from the hospital.

8

" 'In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. We review the court's resolution of the factual inquiry under the deferential substantial-evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review.' (*People v. Saunders* (2006) 38 Cal.4th 1129, 1133–1134 [45 Cal.Rptr.3d 66, 136 P.3d 859].) On appeal we consider the correctness of the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision. (*People v. Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704] [if the trial court's ruling is correct ' " 'upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion' " ']; *People v. Braeseke* (1979) 25 Cal.3d 691, 700-701 [159 Cal.Rptr. 684, 602 P.2d 384].)" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145.)

"It is well established that, as a general proposition, the provisions prohibiting unreasonable searches and seizures found in both the federal and California constitutions and the exclusionary rule based thereon are applicable only to searches and seizures by the government or its agents, not to the actions of private individuals." (*People v. De Juan* (1985) 171 Cal.App.3d 1110, 1120.) "Thus, evidence discovered in a private search is not subject to exclusion for failure to obtain a search warrant or otherwise comply with the requirements of the [F]ourth [A]mendment." (*United States v. Sherwin* (9th Cir. 1976) 539 F.2d 1, 5-6 (*Sherwin*); see *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 487 [plurality opn.] (*Coolidge*) [Fourth Amendment not implicated when defendant's wife brought out defendant's guns and clothing, and then handed them over to police]; *Burdeau v. McDowell* (1921) 256 U.S. 465, 474 [the Fourth Amendment was not implicated when private detectives seized incriminating items from defendant's office and turned those items over to government officials].) "And once a private search is completed, the subsequent involvement of government agents does not retroactively transform the original intrusion into a governmental search." (*Sherwin, supra*, at p. 6, citing to *United States v. Harless* (9th Cir. 1972) 464 F.2d 953, 957; *Eisentrager v.*

9

*Hocker* (9th Cir. 1971) 450 F.2d 490, 492; *Wolf Low v. United States* (9th Cir. 1968) 391 F.2d 61.)

We have found no published case in California concerning the issue before us. However, we find both persuasive and dispositive out-of-state decisions in which the courts consistently hold that a defendant's Fourth Amendment rights are not implicated where he voluntarily submits himself for treatment for a gunshot wound, the removal of the bullet is not done at the request or direction of the police, and the hospital staff later voluntarily relinquishes the bullet as evidence to aid the police. (See *State v. Cowan* (Tenn. Crim. App. 2000) 46 S.W.3d 227, 232-233 (*Cowan*); *Commonwealth v. Johnson* (1999) 556 Pa. 216 [727 A.2d 1089, 1097-1098] (*Johnson*); *Houston v. State* (1989) 299 Ark. 7 [771 S.W.2d 16, 17-18]; *Craft v. Commonwealth* (1980) 221 Va. 258 [269 S.E. 2d 797, 800-801] (*Craft*); *Commonwealth v. Storella* (1978) 6 Mass. App. Ct. 310 [375 N.E.2d 348, 351] (*Storella*); *People v. Abdalla* (1976) 70 Mich. App. 697 [247 N.W.2d 332, 334-336]; *Webb v. State* (Tex. Crim. App. 1971) 467 S.W.2d 449, 451 (*Webb*); *State v. Turner* (1966) 101 Ariz. 85 [ 416 P.2d 409, 411-412] (*Turner*).) We also find both persuasive and dispositive those out-of-state decisions in which the courts consistently hold that, for purposes of the Fourth Amendment, a defendant does not retain either a property right or a privacy interest in the removed bullet. (See *Cowan, supra*, 46 S.W.3d at p. 233 ["[d]efendant demonstrated no subjective expectation of privacy in the [removed] bullet, nor do we find that society is willing to recognize a reasonable expectation of privacy in a bullet surgically removed under these circumstances"]; *Johnson, supra*, 727 A.2d at p. 1098 ["the circumstances in this case clearly demonstrate that [defendant] had no reasonable expectation of privacy, which is to say, one that society would accept as legitimate, once the bullet had been removed from him"]; *Craft, supra*, 269 S.E.2d at p. 800 [defendant had no property right in bullet removed from his

10

body during the performance of " 'appropriate surgical therapy' " by attending physician].) [11]

In challenging the trial court's ruling in effect that the hospital staff were not acting as agents of the police, defendant requests that we draw inferences from the evidence that would support a contrary finding. We decline to do so. As an appellate court we " 'must view the evidence in the light most favorable to [the prosecution] and presume . . .the existence of every fact the trier could reasonably deduce from the evidence.' (*People v. Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) 'Reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding.' (*People v. Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)" (*People v. Snead* (1991) 1 Cal.App.4th 380, 384.) In all events, as we now discuss, we see no merit to defendant's arguments.

---

[11] Although the Attorney General cites to *Johnson, supra*, 727 A.2d 1089, and *Cowan, supra*, 46 S.W.2d 227, defendant makes no attempt to distinguish these relevant cases in his reply brief. Instead, he asks us to consider other cases, which we conclude are inapposite as they concern situations in which the police were found to have employed their official status to effect a search or seizure, which invaded the defendant's possessory interest or privacy interest in the evidence. (See *United States v. Neely* (5th Cir. 2003) 345 F.3d 366, 369 [police request to hospital staff to turn over defendant's clothing was sufficient to constitute state action]; *Jones v. State* (Fla. 1994) 648 So.2d 669, 673-674, 675 [during interview with defendant in his hospital room police seized bag of clothing without defendant's consent; later police seized defendant's money and lottery tickets being held by hospital security and apparently released to police at their request]; *People v. Watt* (N.Y. Sup. Ct. 1983) 118 Misc.2d 930 [462 N.Y.S.2d 389, 391] [hospital staff turned over defendant's clothing at the request of the police]; *Commonwealth v. Williams* (2010) 76 Mass. App. Ct. 489 [923 N.E.2d 556, 559-560] [court analyzed case based on finding that nurse's act of giving detective three bags containing defendant's clothing, over defendant's objection, was seizure by the police that implicated the Fourth Amendment, distinguishing the case from the situation in which a private party seized evidence and voluntarily relinquished it to the police]; *State v. Binner* (1994) 131 Ore. App. 677 [886 P.2d 1056, 1057, 1059] [court upheld suppression of blood test results for drugs after finding that defendant's consent to test drawn blood for blood alcohol content did not include consent to test for drugs]; see also *Winston v. Lee* (1985) 470 U.S. 753, 758, 761 [court refused to compel surgical removal of bullet over defendant's objection]; *People v. Scott* (1978) 21 Cal.3d 284, 290-291 [court refused to compel semen sample over defendant's objection].)

Having determined "there was no antecedent direction" from the police for the hospital staff to remove the bullet from defendant, the trial court could reasonably infer that "a medical professional ha[d] made an independent decision that removal of the bullet was in the best interests of [defendant]." (*Johnson, supra*, 727 A.2d at p. 1098; see *Craft, supra*, 269 S.E.2d at p. 799 [when defendant voluntarily presented himself in hospital "he impliedly consented to be given necessary medical attention"]; *Turner, supra*, 416 P.2d at p. 411 ["[w]e must conclude from the fact the defendant went to the Tucson Medical Center for treatment that it was his express wish that the doctor remove the bullet if such was reasonable in the course of treatment of defendant's injury"].) The hospital nurse's subsequent acts – notifying the police that the bullet had been removed and would be placed in a secure evidence locker for later retrieval by the police - "were not the result of official pressure or duress. They were merely praiseworthy acts of citizen cooperation. '[I]t is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals.' [(*Coolidge, supra* 403 U.S. at p. 488.)]" (*Storella, supra*, 375 N.E.2d at p. 351; see *Stone v. Powell* (1976) 428 U.S. 465, 484, 486 [purpose of exclusionary rule is "the deterrence of police conduct that violates Fourth Amendment rights," not "to redress the injury to the privacy of the victim of the search or seizure, for any '[r]eparation comes too late' "]; *Craft, supra*, 269 S.E.2d at p. 800 [bullet surgically removed from defendant "lawfully came into the possession of [the physician] and, under the circumstances of this case, there was no reason why [the bullet] should not have been delivered to and received by the officers"]; *Webb, supra*, 467 S.W.2d at p. 451 [court rejected defendant's argument that he should have been warned that doctors would turn over bullet to police; the court knew of "no rule of law which prohibits an individual from submitting to police officials objects which are lawfully in his possession, and the bullet was lawfully obtained from [defendant]"].) Even if the hospital staff's removal of the bullet was undertaken in whole or in part to seize the bullet to aid the police, no evidence supports defendant's argument that the hospital did so at the request of Sergeant Fleming. The record demonstrates only that the medical staff "acted officiously and not

12

at the behest of the government.  A private search in which the government is in no respect involved either directly as a participant or indirectly as an encourager is not subject to the *Fourth Amendment* because the private actor is motivated in whole or in part by a unilateral desire to aid in the enforcement of the law."  (*United States v. Gumerlock* (9th Cir. 1979) 590 F.2d 794, 800, fn. omitted.)  We therefore must reject defendant's argument that "the warrantless search and seizure of the bullet" violated his Fourth Amendment rights.

Nor are we persuaded by defendant's argument that the police were required to obtain a search warrant before retrieving the bullet from the secure evidence locker in the hospital and performing analyses on the bullet.  The hospital nurse did not become an agent for the police because she chose, on her own initiative, to leave the bullet in a secure evidence locker for later retrieval by the police.  Had the hospital nurse, instead, on her own initiative, taken the bullet to the police station to be used as evidence against defendant, "there can be no doubt under existing law that the [bullet] would later have been admissible in evidence.  [(Cf. *Burdeau v. McDowell*, *supra*, 256 U.S. 465.)]" (*Coolidge, supra,* 403 U.S. at p. 487.)  Because the police lawfully came into possession of the bullet, they were not required to obtain a warrant before performing any analyses on the bullet.  (See *United States v. Snowadzki* (9th Cir. 1984) 723 F.2d 1427, 1430 [once private person delivered incriminating documents to IRS, the agents needed no warrant to read the documents]; *People v. Rogers* (1966) 241 Cal.App.2d 384, 389-390 ["[o]nce articles have lawfully fallen into the hands of the police they may . . . test them to see if they have been used in the commission of a crime . . . or preserve them for use as evidence at the time of trial"].)

## III.  Defendant's *Pitchess* Motions

### A.    Relevant Facts

Before trial, defendant sought discovery of the personnel file of Oakland Police Sergeant Sean Fleming, pursuant to Evidence Code sections 1043 and 1045, and *Pitchess, supra*, 11 Cal.3d 531.  Defendant specifically sought information about "prior acts of fabrication and/or misstatements of facts no matter how catalogued; the

13

fabrication of charges and/or the fabrication and/or destruction of evidence and the authoring or acquiescing to false or misleading police reports." The basis for the motion was Fleming's alleged violation of police department policy regarding the handling and preservation of evidence in the case against defendant. In opposition to the motion, Officer Taiwo Peña-Hornung, as the custodian of records for the Oakland Police Department Internal Affairs Division (hereafter custodian of records), submitted a declaration stating, "I conducted a thorough search of all files in the Personnel Section of the Oakland Police Department for Sgt. S. Fleming . . . . I found no pertinent complaint files within the categories requested for this officer." The trial court denied the discovery motion, with prejudice, on the grounds that defendant had failed to demonstrate good cause for the request and the custodian of records had declared there were no complaints within the requested categories.

Subsequently, defendant renewed his discovery motion, alleging that his counsel had become aware of an incident in a separate case in which Fleming allegedly violated police department policy regarding the handling and preservation of evidence. In response, Officer Taiwo Peña-Hornung, as the custodian of records, submitted a modified declaration, stating: "I conducted a thorough search of all files in the Personnel Section of the Oakland Police Department for Sgt. S. Fleming . . . . I found no complaint files for this officer." The trial court denied defendant's renewed *Pitchess* motion, finding that "there is sufficient cause to grant the motion; however, upon review of the records, I find that there's no applicable records based on the declaration filed by the City Attorney."

### B.     Analysis

The procedure governing the resolution of a defendant's *Pitchess* motion is well settled. "When a trial court concludes a defendant's *Pitchess* motion shows good cause for discovery of relevant evidence contained in a law enforcement officer's personnel files, the custodian of the records is obligated to bring to the trial court all 'potentially relevant' documents to permit the trial court to examine them for itself. ([*City of Santa Cruz v. Municipal Court* (1989)] 49 Cal. 3d [74,] 84.) A law enforcement officer's personnel record will commonly contain many documents that would, in the normal case,

14

be irrelevant to a *Pitchess* motion, including those describing marital status and identifying family members, employment applications, letters of recommendation, promotion records, and health records. [(See § 832.8.)] Documents clearly irrelevant to a defendant's *Pitchess* request need not be presented to the trial court for in camera review. But if the custodian has any doubt whether a particular document is relevant, he or she should present it to the trial court. Such practice is consistent with the premise of Evidence Code sections 1043 and 1045 that the locus of decisionmaking is to be the trial court, not the prosecution or the custodian of records. The custodian should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion. A court reporter should be present to document the custodian's statements, as well as any questions the trial court may wish to ask the custodian regarding the completeness of the record. (See *People v. Jackson* [(1996)] 13 Cal. 4th [1164,] 1221, fn. 10 [explaining that this court 'reviewed the sealed record of the in camera proceeding'].) [¶] The trial court should then make a record of what documents it examined before ruling on the *Pitchess* motion. Such a record will permit future appellate review. If the documents produced by the custodian are not voluminous, the court can photocopy them and place them in a confidential file. Alternatively, the court can prepare a list of the documents it considered, or simply state for the record what documents it examined. Without some record of the documents examined by the trial court, a party's ability to obtain appellate review of the trial court's decision, whether to disclose or not to disclose, would be nonexistent. Of course, to protect the officer's privacy, the examination of documents and questioning of the custodian should be done in camera in accordance with the requirements of Evidence Code section 915, and the transcript of the in camera hearing and all copies of the documents should be sealed.' (See *People v. Samayoa* (1997) 15 Cal.4th 795, 825 [64 Cal.Rptr.2d 400, 938 P.2d 2] [after ruling on the *Pitchess* motion, '[t]he magistrate ordered that all remaining materials be copied and sealed'].)" (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1230, fns. omitted (*Mooc*).)

"Accordingly, in cases such as this where the custodian of records does not produce the entire personnel file for the court's review, he or she must establish on the record what documents or category of documents were included in the complete personnel file. In addition, if it is not readily apparent from the nature of the documents that they are nonresponsive or irrelevant to the discovery request, the custodian must explain his or her decision to withhold them. Absent this information, the court cannot adequately assess the completeness of the custodian's review of the personnel files, nor can it establish the legitimacy of the custodian's decision to withhold documents contained therein. Such a procedure is necessary to satisfy the Supreme Court's pronouncement that 'the locus of decisionmaking' at a *Pitchess* hearing 'is to be the trial court, not the prosecution or the custodian of records.' ([*Mooc*], *supra*, 26 Cal.4th at p. 1229.) It is for the court to make not only the final evaluation but also a record that can be reviewed on appeal." (*People v. Guevara* (2007) 148 Cal.App.4th 62, 69 (*Guevara*); see *People v. Wycoff* (2008) 164 Cal.App.4th 410, 414-415 (*Wycoff*).)

As defendant correctly contends, there is no indication in this record that the custodian of records ever provided Sergeant Fleming's entire personnel file for the trial court's in camera review at any time. While the custodian of records stated there were no complaints in Sergeant Fleming's personnel file, she did not " 'state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's [renewed] *Pitchess* motion.' ([*Mooc*], *supra*, 26 Cal.4th at p. 1229.)" (*Guevara, supra*, 148 Cal.App.4th at p. 68.)

" 'We therefore conditionally reverse the judgment and remand for a new *Pitchess* hearing in which the proper procedure is followed.' (*Guevara, supra*, 148 Cal.App.4th at p. 69.)" (*Wycoff, supra*, 164 Cal.App.4th at p. 415.) If the trial court decides "on remand that relevant information exists and should be disclosed[,] . . . in that event, . . . the trial court 'must order disclosure, allow [defendant] an opportunity to demonstrate prejudice, and order a new trial if there is a reasonable probability the outcome would have been different had the information been disclosed.' " (*People v. Gaines* (2009) 46 Cal.4th 172,

181.)  If the trial court again "finds there are no discoverable records, or that there is discoverable information but [defendant] cannot establish that he was prejudiced by the denial of discovery, the judgment shall be reinstated as of that date." (*Wycoff, supra*, at p. 416.)  By providing for the reinstatement of the judgment, defendant "retains the right to appeal from the judgment for the limited purpose of challenging the [new] *Pitchess* findings." (*Wycoff, supra*, at p. 415.)

## DISPOSITION

The judgment is conditionally reversed.  The cause is remanded to the trial court with directions to hold a new in camera hearing on defendant's renewed *Pitchess* motion in conformance with the procedures described in this opinion.  If the trial court finds there are discoverable records, they shall be produced and the court shall conduct such further proceedings as are necessary and appropriate.  If the trial court finds that there are no discoverable records, or that there is discoverable information but defendant cannot establish that he was prejudiced by the denial of discovery, the judgment shall be reinstated as of that date.

_____
Jenkins, J.

We concur:

_____
Pollak, Acting P. J.

_____
Siggins, J.

*People v. Cordarryl Steen*, A139526

17